# United States Court of Appeals
## For the First Circuit

No. 11-1627

UNITED STATES OF AMERICA,

Appellee,

v.

RALPH APPOLON,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, District Judge]

Before

Howard, Stahl, and Lipez,
Circuit Judges.

Derege B. Demissie for defendant-appellant.
Ryan M. DiSantis, Assistant United States Attorney, with whom
Carmen M. Ortiz, United States Attorney, was on brief, for
appellee.

April 29, 2013

**LIPEZ, Circuit Judge**.  Appellant Ralph Appolon was charged with one count of conspiring to commit wire fraud in violation of 18 U.S.C. § 371 and four counts of committing wire fraud in violation of 18 U.S.C. § 1343.  These charges arose out of his connection to a mortgage fraud scheme.  After a lengthy jury trial, Ralph[1] was found guilty of all charges against him, and was sentenced to a term of imprisonment followed by supervised release.  He raises a number of challenges to the district court's evidentiary rulings, the sufficiency of the evidence against him, and the loss calculation used to establish his sentence.  Upon careful consideration, we affirm his convictions and sentence.

**I.**

**A.  The Mortgage Fraud Scheme**

The companion case to this appeal, United States v. Appolon, 695 F.3d 44, 51-53 (1st Cir. 2012) ["Daniel Appolon"], lays forth the basic facts of the mortgage fraud scheme at issue in great detail, and we assume the reader's familiarity with that opinion.[2]  As we described,

> [t]he scheme itself was uncomplicated: appellants and their coconspirators arranged

---

[1] A number of the conspirators in this scheme are related and therefore share the same surname.  For clarity's sake, we refer to the Appolons by their first names throughout the opinion.

[2] Ralph's case was originally joined to that of his codefendants, but he was tried separately after his attorney withdrew shortly before the joint trial.  Daniel Appolon, 695 F.3d at 52 n.1.

> for straw buyers to purchase real property at
> the asking price, falsified mortgage loan
> applications for the straw buyers to obtain
> financing for an artificially-inflated
> purchase price, and pocketed the difference.
> The loans secured by each of the properties
> involved in appellants' scheme eventually went
> into default, and most of the properties were
> forced into foreclosure at huge losses for the
> lenders.

Id. at 51. Twenty-one properties were sold as part of this scheme.

Id. at 53. The conspiracy involved a number of individuals, including: Eric Levine, a real estate lawyer who had been suspended from the practice of law; Daniel Lindley, another real estate attorney; Latoya Haltiwanger, a residential mortgage broker; and Ernst Appolon, a realtor. Id. at 52. Ernst Appolon's brothers, Daniel and Ralph, also participated in the scheme. Id.

The trial record discloses the following facts, described in the light most favorable to the jury's verdict. See United States v. Mubayyid, 658 F.3d 35, 41 (1st Cir. 2011). Ralph was a loan originator with New England Merchants, a real estate company where he worked with Ernst and Daniel. His main responsibility was to recruit and cultivate straw buyers to participate in the fraudulent property deals. These buyers typically provided their names and credit histories for the purchase in exchange for various benefits, including having mortgage payments made on their behalf or receiving remuneration for their participation. Ralph also created and processed loan applications for the property deals,

which contained various representations regarding the straw buyers who were purportedly applying for the loans.

Ralph's wire fraud charges arose from his involvement with transactions surrounding two properties located at 586 East Third Street, South Boston, MA ("the Third Street property") and 3231 Washington Street, Jamaica Plain, MA ("the Washington Street property").

## B.  The Third Street Property

The Third Street property's purchase took place in June 2005.  Ralph's coconspirators recruited him to find a purchaser, telling him that he could write the mortgage documents and would obtain a commission on the loan.  When Ralph was unable to secure a purchaser, Levine and the seller, Robert Odimegwu, asked Ralph to buy the property himself, on the conditions that Ralph would receive a portion of the realtor commission as well as a hefty referral fee, and that Levine and Odimegwu would pay the mortgage for a year.

Ralph assented, but put the property in the name of his mother-in-law, Violetha Clemendore.  Clemendore agreed to assist Ralph and sign loan documents at his request, believing that her participation would help Ralph and her daughter with their real estate ventures.  He prepared and submitted a mortgage loan application on Clemendore's behalf to Long Beach Mortgage.  This application contained a number of false statements concerning,

inter alia, the purchase price, Clemendore's intent to maintain her primary residence at the property, and her monthly income. Based on the application and related paperwork, Long Beach Mortgage approved 100 percent financing for the purchase and wired loan proceeds to Lindley's account. The proceeds were transferred to Levine's account after the closing, and Levine in turn paid Ralph $60,000, as well as a loan origination commission of almost $6,000.

## C.  The Washington Street Property

Ralph also participated in the September 2005 sale of the Washington Street property. A man named Peter Robinson served as the straw buyer for this purchase. Robinson testified that he spoke with Ralph at least once during the purchasing process, and on one occasion another conspirator witnessed Robinson, Ernst, and Ralph meet together at the New England Mortgage office. Robinson's loan application listed Ralph as the loan interviewer, and Ralph also acted as the broker representative for the purchase.

Robinson's purported loan application was submitted to a company called WMC Mortgage Corporation ("WMC Mortgage"). The application contained various false statements, including information about his employment at a second job, misrepresentations regarding his monthly income, and a $29,000 bank account balance he did not actually have. The closing for the Washington Street property took place in September 2005, with Robinson, Ernst, and an attorney present. Ralph was at the closing

for a short period of time.  After the closing, Ralph received $8,320 in excess funds from one of Levine's accounts, as well as a broker fee in a similar amount.

After a nine-day trial, the jury returned guilty verdicts on the conspiracy count as well as all four wire fraud counts.  The district court sentenced Ralph to 60 months' imprisonment on the conspiracy count and 70 months' imprisonment on each wire fraud count, all to run concurrently.  Ralph was also sentenced to two years of supervised release, and ordered to forfeit approximately $1.9 million that he had gained from his participation in the conspiracy.  This timely appeal followed.

## II.

Ralph raises various challenges to his conviction and sentence, some of which coincide with arguments raised by his coconspirators in Daniel Appolon.  We begin by addressing the arguments unique to Ralph's appeal.

### A.  Sufficiency of the Evidence

Ralph moved for a judgment of acquittal on all of the charges against him under Federal Rule of Criminal Procedure 29. The district court denied Ralph's motion, and he appeals from that ruling.  We review a challenge based on insufficiency of the evidence de novo, viewing the evidence in the light most favorable to the jury's verdict.  United States v. Rodríguez–Vélez, 597 F.3d 32, 38 (1st Cir. 2010).  We give equal weight to direct and

circumstantial evidence. See United States v. Ortiz, 447 F.3d 28, 32 (1st Cir. 2006). The inquiry focuses on whether "'a rational jury could have found that the government proved each element of the crime beyond a reasonable doubt.'" United States v. Mardirosian, 602 F.3d 1, 7 (1st Cir. 2010) (quoting United States v. Sepulveda, 15 F.3d 1161, 1173 (1st Cir. 1993)). We begin with Ralph's arguments as to the substantive wire fraud counts before turning to his conviction on the conspiracy count.

### 1. The Wire Fraud Counts

The elements of a wire fraud conviction under 18 U.S.C. § 1343 are: (1) a scheme or artifice to defraud using false or fraudulent pretenses; (2) the defendant's knowing and willing participation in the scheme or artifice with the intent to defraud; and (3) the use of the interstate wires in furtherance of the scheme. See United States v. Sawyer, 85 F.3d 713, 723 (1st Cir. 1996); United States v. Cassiere, 4 F.3d 1006, 1011 (1st Cir. 1993). The false or fraudulent representation must be material. Neder v. United States, 527 U.S. 1, 25 (1999); United States v. Blastos, 258 F.3d 25, 27 (1st Cir. 2001).

### a. Counts Two and Three (Third Street Transaction)

Counts Two and Three arose from Ralph's participation in the sale of the East Third Street property to Ralph's mother-in-law, Clemendore. Appellant's challenge to these counts concerns the materiality of his misrepresentations. A material statement

"has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." Neder, 527 U.S. at 16 (quoting United States v. Gaudin, 515 U.S. 506, 509 (1995)) (internal quotation marks omitted) (alteration in original). The government need not prove that the decisionmaker actually relied on the falsehood or that the falsehood led to actual damages. See id. at 24-25 ("The common-law requirements of justifiable reliance and damages . . . plainly have no place in the federal fraud statutes." (internal quotation marks omitted)).

Here, the misrepresentations at issue were contained in the mortgage application Ralph prepared and submitted to Long Beach Mortgage. Ralph observes that the government presented no evidence regarding Long Beach Mortgage's loan evaluation process, in contrast to the Washington Street transaction, where the government presented witness testimony from a WMC Mortgage representative who spoke about the types of factors that company used when evaluating an application. Without any information regarding the types of information that Long Beach found relevant in deciding whether to approve a loan, Ralph argues, the government could not establish that any of the misrepresentations on the application were factors in the company's decisionmaking.

The record defeats this contention. The Long Beach loan file for the Third Street transaction included application forms

that specifically sought information regarding the purchaser's income, assets, and intent to reside in the property, all of which were designed to assess the borrower's creditworthiness.  Cf. United States v. Kenrick, 221 F.3d 19, 32 (1st Cir. 2000) (stating, in context of bank fraud conviction, that "misrepresentation about a borrower's creditworthiness can certainly be a material falsehood that supports a []conviction").  Ralph provided responses to these requests that the trial testimony established as untrue, including a verification of Clemendore's rent, information regarding her employment, and an occupancy agreement that certified her intent to live at the Third Street residence.  The fact that Long Beach's loan application explicitly sought this information from the applicant indicates that Clemendore's responses were capable of influencing its decision.

Moreover, the government adduced other evidence regarding the types of information material to Long Beach's decisionmaking process.  Specifically, the government called Diane Taylor, a representative of WMC Mortgage, the lender for the Washington Street transaction, to testify about WMC Mortgage's practices.  Although Taylor could not speak to Long Beach's lending protocols, she testified about a range of criteria relevant to WMC Mortgage's lending decisions, including information regarding income and employment, assets, and residence at the purchased property.  As noted above, Long Beach's mortgage application requested the same

-9-

information.  Indeed, the trial testimony establishes that the loan file for the Third Street transaction contained loan applications substantially similar to WMC Mortgage's applications, strongly supporting the inference that the two mortgage companies used the same types of information in assessing mortgage applications.  A reasonable jury could thus rely on Taylor's testimony, combined with the similarity between Long Beach's and WMC Mortgage's loan applications, to conclude that Long Beach would have considered the same types of factors in assessing Clemendore's loan application.

In light of all this evidence, it is of no moment that the government did not introduce testimony from a Long Beach representative regarding the specific types of information it found material.  This challenge therefore fails.

### b.    Counts Six and Seven (Washington Street Transaction)

Counts Six and Seven concerned Ralph's engagement with the Washington Street property transaction, and he asserts two main challenges to the sufficiency of the evidence supporting these convictions.  First, he argues that the government failed to present evidence that Ralph knew the representations on the loan application were false or misleading.  Ralph relies heavily on the notion that Robinson, the property's purchaser, dealt primarily with Ernst.  The government introduced other evidence demonstrating Ralph's interactions with Robinson, however, including Robinson's testimony that he spoke with Ralph regarding the transaction on at

least one occasion, and that Ralph was present briefly at the closing. Additionally, another conspirator testified that Robinson came to the office multiple times looking for Ralph, and witnessed Ralph, Ernst, and Robinson meeting at the office on at least one occasion. These facts establish that Robinson had at least some interaction with Ralph regarding the loan transaction. Moreover, testimony from one of Lindley's employees established that Ralph acted as the broker representative on the transaction, and that he put his name on a number of fax transmissions with Lindley's office. Ralph also listed himself as the interviewer on the loan applications that contained the false statements, as well as other forms related to the transaction. The false verification of rent from the lender file listed Ralph as the requesting party and gave New England Merchants' address as the location of Robinson's landlord.[3]

This compilation of evidence gives rise to the reasonable inference not only that Ralph was an active participant in the transaction, but also that he participated with the specific intent to defraud. See United States v. Alfonzo-Reyes, 592 F.3d 280, 291 (1st Cir. 2010) ("Direct evidence is not required to find [a defendant] guilty, and juries are entitled to draw reasonable inferences at trial based on circumstantial evidence."). These

---

[3] Some of the documents described above have not been made part of the record on appeal. We thus rely on the government's descriptions of them, which appellant has not disputed in any way.

facts, joined with Ralph's "general awareness of the mechanics of appellants' scheme," Daniel Appolon, 695 F.3d at 59, are more than sufficient to meet the government's burden.

Ralph's second contention is similarly unavailing. He posits that New England Merchants' offices permitted any employee to use the computer system to generate and transmit forms, thus making it possible that his brother Ernst or some other employee forged Ralph's signature and engaged in the inculpatory wire communications. But Ralph's ability to construct an alternative (and rather speculative) reading of the evidence does not invalidate the jury's conclusion. We ask only whether "a rational fact finder could find that the government proved the essential elements of its case beyond a reasonable doubt." United States v. Marin, 523 F.3d 24, 27 (1st Cir. 2008). As we have explained, the record bears more than sufficient evidence to support the jury's conclusion. More fundamentally, a wire fraud conviction does not require that Ralph "have had any personal involvement in initiating the wire transfers; instead, the use of the wires need only have been 'a reasonably foreseeable part of the scheme in which he participated.'" United States v. Vázquez-Botet, 532 F.3d 37, 63-64 (1st Cir. 2008) (quoting Sawyer, 85 F.3d at 723 n.6). The evidence described above, particularly Ralph's signatures on the transmitted documents, his interactions with WMC Mortgage, and his awareness of the general contours of the fraudulent scheme, was sufficient to

demonstrate that he should have foreseen the use of wire transmissions as a result of his involvement in the Washington Street transaction.

For these reasons, Ralph's conviction on Counts Six and Seven must stand.

### 2. The Conspiracy Count

To sustain a conviction of conspiracy, the government must prove that "1) the defendant agreed to commit an unlawful act, 2) the defendant voluntarily participated in the scheme, and 3) one of the conspirators took an affirmative step toward achieving the conspiracy's purpose." Cassiere, 4 F.3d at 1015. The defendant must have both intended to make the agreement as well as intended to commit the substantive offense. See United States v. Gonzalez, 570 F.3d 16, 24 (1st Cir. 2009). Where the indictment alleges a conspiracy to commit multiple offenses, "the charge may be sustained by sufficient evidence of conspiracy to commit any one of the offenses." United States v. Muñoz-Franco, 487 F.3d 25, 46 (1st Cir. 2007).

Ralph claims that the government failed to prove the existence of an agreement among the conspirators. An agreement is not proven by demonstrating "'mere knowledge of an illegal activity . . . , let alone [] mere association with other conspirators or mere presence at the scene of the conspiratorial deeds.'" United States v. Dellosantos, 649 F.3d 109, 115 (1st Cir. 2011) (quoting

-13-

<u>United States</u> v. <u>Zafiro</u>, 945 F.2d 881, 888 (7th Cir. 1991)).
Rather, the government must prove the existence of an "agreement or
understanding as to each defendant." <u>Id.</u> (quoting <u>United States</u> v.
<u>Rivera-Santiago</u>, 872 F.2d 1073, 1079 (1st Cir. 1989)) (internal
quotation marks omitted). "[C]onspiratorial agreement need not be
express so long as its existence can plausibly be inferred from the
defendants' words and actions and the interdependence of activities
and persons involved." <u>United States</u> v. <u>Boylan</u>, 898 F.2d 230,
241-42 (1st Cir. 1990); <u>see</u> <u>also</u> <u>Muñoz-Franco</u>, 487 F.3d at 45-46.

As the discussion regarding the substantive wire fraud
counts shows, the record is replete with evidence evincing Ralph's
agreement to commit unlawful acts. He made numerous admissions to
an FBI special agent regarding the Third Street transaction,
including that he agreed to purchase the property in his mother-in-
law's name and that he prepared loan applications that he submitted
to the mortgage company. These admissions are supported by volumes
of documentary evidence and testimony establishing the falsity of
the statements contained in the applications that Ralph prepared.
Similar evidence shows his agreement to participate in the
Washington Street scheme, including testimony showing that Ralph
met with Ernst and Robinson on at least one occasion and appended
his name to a number of documents relevant to the transaction.

Ralph's engagement with the scheme rose far beyond
"simple association with the conspirators." <u>United States</u> v.

-14-

<u>Pérez-González</u>, 445 F.3d 39, 49 (1st Cir. 2006). His conduct demonstrates both his intent to engage in a common scheme and specific acts in furtherance of that scheme. Thus, there is no reason to disturb the jury's verdict.[4]

## B.  The Admission of the Lindley Files

Ralph contends that the district court erred in admitting the files of Lindley, who served as the closing attorney on the real estate transactions. Although Ralph frames this contention under the heading of "due process," his brief neither explains why his due process rights were violated by the documents' admission, nor identifies with any precision the particular documents to which this argument is addressed. Ralph's vague allusion to due process notwithstanding, his argument primarily addresses the documents' admissibility under the Federal Rules of Evidence and we therefore treat it as such.

When the defendant has preserved his objections, the district court's evidentiary rulings are reviewed for abuse of discretion. <u>United States</u> v. <u>Jiménez</u>, 419 F.3d 34, 43 (1st Cir. 2005). The government contends that Ralph forfeited this claim below, thereby rendering it subject to plain error review. <u>See</u>

---

[4] Ralph contends that the government did not prove the existence of an agreement between Levine and Ralph, but it is a well-settled proposition that "each coconspirator need not know of or have contact with all other members, nor must they know all of the details of the conspiracy or participate in every act in furtherance of it." <u>United States</u> v. <u>Martínez–Medina</u>, 279 F.3d 105, 113 (1st Cir. 2002); <u>see also</u> <u>Pérez-González</u>, 445 F.3d at 49.

United States v. Chaney, 647 F.3d 401, 406 n.6 (1st Cir. 2011) (observing that "failure to raise an argument or right due to inattention or neglect constitutes forfeiture" and issue is reviewed for plain error).  We need not resolve this question, however, since the district court's admission of these documents was not an abuse of discretion.

Ralph's first challenge goes to the authenticity of the Lindley files.  To introduce a piece of evidence, the proponent must demonstrate "that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  This relatively undemanding rule "requires the trial court to determine if there is a reasonable probability that the evidence is what it is purported to be." United States v. Carlos Cruz, 352 F.3d 499, 506 (1st Cir. 2003) (quoting United States v. Neal, 36 F.3d 1190, 1210 (1st Cir. 1994)) (quotation marks omitted).  The proponent "need not rule out all possibilities inconsistent with authenticity" in order to meet this burden.  Asociación De Periodistas De P.R. v. Mueller, 680 F.3d 70, 79 (1st Cir. 2012) (quoting United States v. Alicea-Cardoza, 132 F.3d 1, 4 (1st Cir. 1997)) (quotation marks omitted).  Evidence can be authenticated in numerous ways, including through the testimony of a witness with knowledge "that an item is what it is claimed to be."  Fed. R. Evid. 901(b)(1).

The record shows that the government laid a sufficient foundation for the admission of the Lindley files.  On the second

day of trial, before testimony began, the parties had a colloquy with the district court regarding the files. When the government sought to have them admitted provisionally before their authentication, Ralph objected to "the use of documents that are not testified to by anybody and . . . the authenticity of which is in dispute, at least from coming in without a witness." The government responded that MacPhee, one of its witnesses and Lindley's former employee, could serve as such a witness. In light of this representation, the district court gave the government permission to "use them," but with the caveat that they would not be "formally in evidence until they're qualified for admission."

MacPhee later gave the promised testimony. She stated that she was responsible for the filing system at Lindley's office, and kept files for "real estate matters." She also discussed her role in updating and maintaining the records, and identified the files when they were presented to her. After the government moved to admit the files into evidence, the court concluded during a brief sidebar that "there's an adequate foundation for the admission," but clarified that the files would not be admitted for the truth of their contents.[5] As someone who maintained, reviewed and worked with the files, MacPhee was well-positioned to recognize

_____

[5] The court gave a limiting instruction after the sidebar concluded, and another instruction at the close of evidence. Ralph's counsel asserted no further objections to the admissibility of the files, suggesting that he did indeed forfeit this argument.

-17-

and verify the documents in question. Her testimony was more than sufficient to establish a reasonable probability that the Lindley files were what they purported to be.

Ralph also suggests that the Lindley files are inadmissible hearsay because, despite the court's statement to the contrary, they were admitted for their truth and do not fall under any exception to the hearsay rule. Fed. R. Evid. 801. This objection misapprehends the files' probative significance. The files in question contained numerous records, including correspondence with lenders and other participants in the transactions, copies of the loan applications, and documents related to the transactions' closings. These files were not introduced for the purpose of establishing the truth of the assertions contained therein, but rather, as instrumentalities of the crimes in question. To the extent that the government relied on any representations contained within these documents, the representations' probative value was not for their truth. Indeed, the government sought to admit them for a wholly different purpose -- "to prove that the statements were made," and to later demonstrate "through other admissible evidence[] that [the statements] were false." United States v. Munson, 819 F.2d 337, 340 (1st Cir. 1987) (citation omitted) (quotation marks omitted). Consequently, they are not hearsay.

For these reasons, the district court did not err in admitting the Lindley files into evidence.

## C. Evidence of Uncharged Conduct

Ralph argues that the district court, applying Rule 404(b), improperly admitted evidence related to his involvement in two real estate transactions that were not the basis of his indictment. In general, "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," i.e., as propensity evidence. Fed. R. Evid. 404(b)(1). Evidence of other acts may be admissible, however, if it has "special relevance," United States v. Rodríguez-Berríos, 573 F.3d 55, 64 (1st Cir. 2009), such as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," Fed. R. Evid. 404(b)(2). Our circuit employs a two-part test in evaluating the admissibility of evidence under Rule 404(b). First, we determine whether the proffered evidence truly possesses "special relevance." Rodríguez-Berríos, 573 F.3d at 64. If it does, we then apply Rule 403 to ascertain whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice. Id.; see also Fed. R. Evid. 403 (permitting court to exclude relevant evidence if there is danger of, inter alia, "unfair prejudice, confusing the issues, [or] misleading the jury"). We review the district court's

-19-

determination for abuse of discretion. <u>United States</u> v. <u>Luna</u>, 649 F.3d 91, 103 (1st Cir. 2011).[6]

The evidence at issue concerned Ralph's participation in the purchase of two properties located at 99 Wayland Street and 25 Nelson Street. The Wayland Street and Nelson Street transactions were markedly similar to those that formed the basis of the indictment, in terms of both how the transactions were conducted and the roles of the assorted players. The transactions both involved the use of two different purchase prices, falsified information on loan applications, Ralph's involvement as the loan originator, Levine or Lindley's involvement in the real estate closing, and Ralph's receipt of commissions after the closing. This evidence is highly probative for multiple reasons, including to show Ralph's intent to engage in the conspiracy, to demonstrate his knowledge of the conspiracy's mechanics, and to eradicate any doubt that his participation was somehow unintentional. <u>See</u> <u>United States</u> v. <u>Gonzalez-Sanchez</u>, 825 F.2d 572, 581 (1st Cir. 1987) (holding that "evidence of [defendant's] involvement with the same

---

[6] The government argues that the evidence of uncharged conduct is admissible for an independent reason, which is that it provides proof of the conspirators' modus operandi. We perceive little, if any, distinction between this argument and the government's Rule 404(b) argument, since both rely on the marked similarities between the charged conduct and the uncharged conduct. Indeed, our cases have explicitly noted that such similarities may give the evidence "special relevance" for Rule 404(b) purposes. <u>See</u> <u>United States</u> v. <u>Wyatt</u>, 561 F.3d 49, 53 (1st Cir. 2009). Thus, we believe it more appropriate to analyze the evidence of uncharged conduct in this case under the rubric of Rule 404(b).

people in past arson and fraud schemes is especially probative of [] whether he was an innocent 'tool' of others or a knowing participant in the conspiracy").  The uncharged transactions also took place within the same general timeframe as the charged ones, further supporting the notion that they were part and parcel of the same scheme.  Any minimal variation in certain aspects of the transactions' execution does not render the uncharged conduct irrelevant.  See Wyatt, 561 F.3d at 53 (holding that even though evidence of other transaction was not identical to allegedly criminal transaction at issue, the transactions "bore enough indicia of similarity" to support admissibility); United States v. Landrau-López, 444 F.3d 19, 24 (1st Cir. 2006) ("The other bad act need not be identical to the crime charged so long as it is sufficiently similar to allow a juror to draw a reasonable inference probative of knowledge or intent.").  Consequently, the district court did not err in deciding that this evidence was relevant conduct for the purposes for Rule 404(b).

The evidence survives Rule 403's balancing analysis for related reasons.  We have observed that while "there is always some danger that the jury will use other bad acts evidence to infer criminal propensity," Rule 403 demands the exclusion of such evidence "only when its probative value is substantially outweighed by its potential unfairly to prejudice the defendant."  Landrau-Lopez, 444 F.3d at 24; Fed. R. Evid. 403.  The only specific

-21-

prejudice Ralph identifies comes from the testimony of the Wayland Street property's ostensible owner, Rose Charles. Charles was the best friend of Ralph's mother, and testified in some detail about her interactions with Ralph during the course of the Wayland Street transaction. Although Ralph contends that her testimony was unnecessarily inflammatory, the trial record reveals that it was largely devoted to explaining her participation in the transaction. Her testimony also addressed the disparity between her beliefs regarding the nature of the deal and Ralph's representations to the lender. Charles did testify at several points about the personal impact the transaction had on her, as well as a subsequent conversation where she "forgave" Ralph for his misdeeds. Despite the emotional nature of this testimony, the record does not support the notion that the government admitted this evidence to "paint[] Appolon as a bad person," as Ralph contends. Although not every sentence of Charles's testimony was strictly relevant to facts disputed at trial, the vast bulk of it was highly probative.

We acknowledge that the similarity of the uncharged conduct at issue simultaneously establishes its relevance and heightens the possibility that the jury will draw an unfair inference of propensity. See United States v. Varoudakis, 233 F.3d 113, 123 (1st Cir. 2000). But given the facts of this case and the notable similarity between the uncharged conduct and the basis of Ralph's indictment, we are assured that the district court properly

evaluated the "risk of an improper criminal propensity inference .

. . in light of the totality of the circumstances."  Id. at 122.

For these reasons, we affirm the district court's ruling as to the uncharged conduct.

**D.  Summary Evidence**

Ralph's remaining arguments are largely foreclosed by our opinion in Daniel Appolon.  He contends that the district court erred in admitting the testimony of a witness, Thomas Zappala, who summarized voluminous documentary evidence, as well as certain charts used during Zappala's testimony.[7]  Ralph objects that Zappala's summary testimony addressed evidence not admitted at trial, but Federal Rule of Evidence 1006 does not require that the documents being summarized also be admitted.  Fed. R. Evid. 1006 (stating that "proponents must make the originals or duplicates available for examination or copying . . . [a]nd the court may order the proponent to produce them in court"); United States v. Milkiewicz, 470 F.3d 390, 396 (1st Cir. 2006) ("[T]he evidence

_____

[7] The district court did not explicitly state the rule under which it admitted the charts into evidence.  The government, for its part, cited "Federal Rule of Evidence 2006" in arguing for the documents' admissibility, but there is no such rule.  The government was apparently invoking Rule 1006, and the district court evidently admitted the charts on that basis.  We therefore analyze the admission of this evidence under Rule 1006.  In the future, however, "it would be a better practice if the court specified which evidentiary rule it was relying upon because [] summaries are subject to different rules with different requirements and purposes."  Daniel Appolon, 695 F.3d at 62 n.7.  The same is true of the government.

underlying Rule 1006 summaries need not be introduced into evidence").  Accordingly, whether the documents themselves were introduced is of no consequence.  To the extent that Ralph argues the district court abused its discretion by admitting Zappala's testimony, our opinion in Daniel Appolon explains why this argument lacks merit and we need not repeat ourselves here.  See Daniel Appolon, 695 F.3d at 63 (holding that "[t]here was no abuse of discretion in permitting [Zappala] to testify").[8]

## E.  The Sentence

Ralph's sentencing arguments rehearse those his coconspirators raised in the companion case.  Like his fellows, Ralph contends that the district court should have used the gain to him, rather than loss to the victims, as the appropriate measure of loss at sentencing.  We declined to accept this contention in Daniel Appolon and find it similarly unpersuasive here.  695 F.3d at 66-70 (discussing why "[t]here is no need to resort to gain" in calculating loss amount at sentencing).  His sentence must therefore remain undisturbed.

---

[8] Ralph's last evidence-related objection is that the admission of certain statements by his coconspirators violates the Confrontation Clause.  We have addressed and rejected this contention numerous times. See, e.g., United States v. Ciresi, 697 F.3d 19, 31 (1st Cir. 2012); United States v. Rivera-Donate, 682 F.3d 120, 132 n.11 (1st Cir. 2012); United States v. De La Paz-Rentas, 613 F.3d 18, 28 (1st Cir. 2010).

### III.

We detect no error in the district court's rulings. Accordingly, Appolon's convictions and sentence are <u>affirmed.</u>

**<u>So ordered.</u>**