# United States Court of Appeals
## For the First Circuit

---

No. 12-2265

UNITED STATES OF AMERICA,

Appellee,

v.

ANTHONY E. ALMEIDA III,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. D. Brock Hornby, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Stahl and Kayatta, Circuit Judges.

---

Henry W. Griffin for Appellant.
Margaret D. McGaughey, Assistant United States Attorney, with whom Thomas E. Delahanty II, United States Attorney, was on brief, for Appellee.

---

April 4, 2014

---

**STAHL, Circuit Judge**. On July 20, 2012, a jury convicted Anthony Almeida of possessing counterfeit obligations of the United States, in violation of 18 U.S.C. § 472. The court sentenced Almeida to fifty-one months' imprisonment. Almeida timely appealed, challenging a number of evidentiary rulings, the sufficiency of the evidence to sustain a conviction, and his sentence. Finding that the district court committed no error in the proceedings below, we affirm.

## I.  Facts & Background

On July 5, 2011, Detective Maurice Drouin was pursuing a vehicle that was traveling with a headlight out on Route 4 in Turner, Maine, when he noticed a Chevrolet Silverado pickup truck that failed to yield to his emergency lights. Although Drouin initially passed the truck in pursuit of the other vehicle, he later located the truck and pulled it over. A search for the truck's license plate number on Drouin's mobile data terminal revealed that the truck was registered to Maynard Martin. The driver provided a temporary Maine license with no photograph issued to John Martin. The passenger gave his name as Joshua Almeida. In fact, the passenger was John Martin and the driver was Anthony Almeida, Joshua's brother.[1]

---

[1]  This opinion will refer to Anthony Almeida as "Almeida" and Joshua Almeida as "Joshua."

Drouin returned to his cruiser and ran another search on the data terminal that showed Martin's license was expired and Joshua's was suspended. Drouin informed the men in the truck of the results of the search, issued a warning, and let them go. As the truck headed off, Drouin ran a cross-agency check on John Martin and Joshua Almeida, retrieving photographs of each. He determined that the passenger was actually John Martin, and (erroneously) identified the driver as Joshua Almeida. He also learned that Joshua Almeida had a history of drug possession and trafficking.

Drouin pursued the truck again, intending to arrest both the driver and the passenger for driving identity offenses. When he stopped the truck, the two occupants had switched places – the real John Martin was driving and Almeida was in the passenger seat. Drouin arrested them both. When he handcuffed and patted down Almeida, Drouin retrieved a wallet from his back pocket. Drouin opened the wallet and saw a large bundle of cash wrapped in rubber bands, a manner of carrying money that Drouin associated with drug traffickers. He put the wallet with the money back in Almeida's pocket.

After the arrests, Drouin's partner arrived on the scene, and the two officers called for a K-9 dog to sniff the exterior of the truck. The dog alerted to the presence of drugs in the truck, and the dog's handler found a small bag of marijuana in the

passenger's side door panel.  On this basis, Drouin and the other officers present conducted a full search of the truck.[2]

During the search, the officers found  a large amount of money wrapped in rubber bands inside a Doritos bag and drug paraphernalia.  Martin stated that the money in the Doritos bag belonged to him.  A dog sniff of the money indicated the presence of drug residue on the bills.  Drouin observed that the money in the Doritos bag was bundled in the same manner as the money in Almeida's wallet.

Prior to transporting Martin and Almeida to jail, Drouin removed the money from Almeida's wallet.  He counted the seized money, placed it in a bag, and retained it as evidence.  Drouin later testified at trial that he believed he had probable cause to seize the contents of Almeida's wallet as proceeds of drug trafficking.

At the Androscoggin County Jail, where Almeida and Drouin were held, there is a policy requiring the staff member who admits an inmate to conduct a preliminary search for weapons and contraband.  If the staff member finds contraband, the shift supervisor may turn it over to the originating arresting agency for further action.  In this instance, jail officials found contraband on Martin and turned it over to Drouin.  At some point after Martin

_____

[2]  Although the magistrate judge discussed the officers' use of the K-9 at length, those details are not pertinent to the outcome of this appeal, so we have omitted them here.

-4-

and Almeida were jailed, Drouin learned from a probation officer that Almeida was Anthony, not his brother Joshua.

Drouin placed the seized items into evidence at the Androscoggin County Sheriff's Office ("ACSO"). As he was counting the seized money, he noticed bills that were smaller than others, and bills with matching serial numbers. Drouin suspected that some of the money was counterfeit and contacted the United States Secret Service. Later that day, he met with Secret Service Special Agent Matt Fasulo, who examined the seized money and concluded that some of it was counterfeit.

On July 6, 2011, Almeida placed two telephone calls to his wife from jail. These conversations were recorded. The second conversation primarily concerned Almeida's efforts to secure bail money, but Almeida also told his wife, "Throw all my shit – all my shit needs to be thrown away. You know what I'm sayin? . . . My suitcase – all that – thrown right away – okay?"

On July 7, 2011, Drouin obtained a warrant to search the impounded truck for additional evidence related to drug trafficking or counterfeiting. The search pursuant to the warrant did not uncover any further evidence. The truck remained at ASCO, subject to asset forfeiture proceedings initiated by the Secret Service. As part of those proceedings, Secret Service agents Kelley Erskine and Joshua Catella performed an inventory search of the truck under Fasulo's direction. That search yielded, among other items, a

Canon printer cartridge. An expert testified at trial that the ink used to produce the counterfeit bills was "consistent with inks manufactured in Canon inkjet printers and copiers."

While the investigation was in progress, Detective Kelly Rupert contacted Drouin to inform him about the discovery of counterfeit bills along Oak Pond Road in Skowhegan, Maine. On June 28, 2011, Travis Pece found $5,950 in loose currency in a pile on the side of the road ("Oak Pond bills"). He turned them in to the police, who determined that the money was counterfeit. Subsequent investigation identified Almeida's fingerprints on two of the Oak Pond bills. The police also determined that the serial numbers on some of the genuine bills in Almeida's wallet matched the serial numbers on several of the Oak Pond bills, as well as some of the counterfeit bills found in the truck. Fasulo testified at trial that these genuine bills were "pattern notes" used to manufacture the matching counterfeit bills.

Almeida was arraigned on August 16, 2011. He pleaded not guilty to the charge of possessing counterfeit obligations of the United States, in violation of 18 U.S.C. § 472. After a jury trial on June 19 and 20, 2012, Almeida was found guilty. On October 15, 2012, the presiding judge sentenced Almeida to fifty-one months' imprisonment. This appeal followed.

## II. Analysis

On appeal, Almeida challenges the district court's decision to admit certain evidence at trial. He also challenges the court's denial of a motion for acquittal, arguing that there was insufficient evidence to prove the counterfeiting charge. Finally, Almeida disputes the reasonableness of his sentence.

### A. Motion to Suppress

On September 6, 2011, Almeida filed a motion to suppress evidence obtained from the officers' search of the truck and from the seizure of the money in Almeida's wallet. Magistrate Judge Rich held a hearing on the motion and issued a recommended decision denying the motion on January 9, 2012. On March 20, 2012, the district court adopted the recommended decision. "We apply a mixed standard of review to the district court's denial of a motion to suppress, reviewing findings of fact for clear error and conclusions of law . . . de novo." United States v. Bolton, 520 F.3d 80, 82 (1st Cir. 2008).

#### 1. Search of the Truck

In his motion to suppress, Almeida argued that the warrantless search of the truck violated the Fourth Amendment, because "[n]o exigency existed which justified a warrantless search." He also challenges the admission of the evidence gathered in the inventory search. These arguments fail at a threshold

issue: whether Almeida had a reasonable expectation of privacy in the truck. We find that he did not.

"The Fourth Amendment's protection against unreasonable searches may only be claimed where a defendant demonstrates that he or she personally has a reasonable expectation of privacy in the place searched." United States v. Symonevich, 688 F.3d 12, 19 (1st Cir. 2012). In the context of a vehicle search, a defendant must show "a property [or] a possessory interest in the automobile" in order to establish a reasonable expectation of privacy.[3] Id.

We have held a person who is "merely a passenger" does not have a reasonable expectation of privacy in a vehicle, id. (internal quotation marks and alterations omitted), but in some circumstances, a person who borrows a vehicle with the owner's permission may have a reasonable expectation of privacy, see United States v. Sugar, 322 F. Supp. 2d 85, 94 (D. Mass. 2004) (citing cases). The facts of this case fall somewhere in between. Almeida was driving the truck during the initial stop, apparently with Martin's permission, but during the second stop Martin was driving and Almeida was the passenger.

---

[3] The Fourth Amendment may also apply when the defendant shows "an interest in the property seized," Symonevich, 688 F.3d at 19, but here Almeida never claimed an interest in the counterfeit bills or any other evidence seized from the truck.

No bright-line rule determines whether a person has a reasonable expectation of privacy in a vehicle; instead the court considers a number of factors:

> ownership, possession, and/or control; historical use of the property searched or the thing seized; ability to regulate access; the totality of the surrounding circumstances; the existence or nonexistence of a subjective anticipation of privacy; and the objective reasonableness of such an expectancy under the facts of a given case. We look, in short, to whether or not the individual thought of the place (or the article) as a private one, and treated it as such.

United States v. Aguirre, 839 F.2d 854, 856-57 (1st Cir. 1988) (citations omitted). In applying these factors to the facts before us, we take guidance from our decisions in United States v. Lochan, 674 F.2d 960 (1st Cir. 1982), and United States v. Sanchez, 943 F.2d 110 (1st Cir. 1991).

In Lochan, as in this case at least part of the time, the defendant was driving the car while the owner of the car was in the passenger seat.[4] 674 F.2d at 965. The court in Lochan further noted that the defendant had the car's registration in his pocket and that he was on a long trip, which might "engender a slightly greater privacy expectation than would a short trip." Id. Nevertheless, the court found that other factors weighed more heavily in favor of finding no expectation of privacy. The court noted, for example, that the defendant "did not own the car, nor

---

[4] Here, the truck was actually registered to Martin's father, but in this case that distinction does not affect our analysis.

was there evidence that he had used the car on other occasions. There was no evidence as to the responsibility or control [the defendant] had over the automobile other than the fact that he was driving it when stopped." Id. Accordingly, the court found that the defendant "failed to meet his burden of proof of a privacy expectation." Id.

In Sanchez, the defendant was driving the vehicle with the apparent permission of its owner (although the court expressed some doubt on that point). 943 F.2d at 113-14. The court observed, however, that the defendant "had only a casual possession of the car. He did not own it, nor, as the district court observed, was there evidence that he had used the car on other occasions." Id. The court explained that "a history of regular use of the [car]" or a "pattern of permission, together with his sole control on a long trip, would have minimized the informal and temporary nature of this specific acquisition of the car." Id. at 114. But in the absence of those circumstances, the court held that the defendant had not met his burden of proof. Id.

In this case, although Almeida was driving part of the time, apparently with Martin's permission, he had "only a casual possession" of the truck. Id. at 113. He did not own it, and he has shown no pattern of repeated use or control over the truck that would allow us to conclude that his possession of the truck was anything more than "informal and temporary." Id. at 114. Almeida

argues that we should infer an expectation of privacy from the fact that there was incriminating evidence in the truck:  "Considering that the contents of the truck . . . formed much of the condemnatory evidence produced at trial, it is logical that [Almeida] bore a reasonable expectation of privacy with respect to the area searched and the items seized."  This argument goes nowhere.  The existence of incriminating evidence does not by itself create a reasonable expectation of privacy.  If it did, the Fourth Amendment would apply to any search the reveals incriminating evidence.  That is obviously not the case.  See United States v. Hershenow, 680 F.2d 847, 855 (1st Cir. 1982) ("[A] legitimate expectation of privacy means more than a subjective expectation of keeping incriminating evidence hidden.")

Considering the relevant factors as applied in Sanchez and Lochan, we conclude that Almeida has failed to meet his burden of proof establishing that he had a reasonable expectation of privacy in the truck.  Thus, he cannot bring a challenge under the Fourth Amendment to the evidence recovered from the truck, either in the course of Drouin's warrantless search or the subsequent inventory search.  We therefore affirm the district court's order denying the motion to suppress with respect to this issue.

### 2.    Seizure of Bills from Almeida's Wallet

Almeida's motion to suppress also challenged Drouin's seizure of money from his wallet prior to Almeida's transfer to

-11-

jail.  The Magistrate Judge recommended denying the motion on two alternate grounds, the "plain view" exception and the "inevitable discovery" exception, and the district court adopted the decision. We affirm on the basis of the inevitable discovery exception.

The application of the inevitable discovery exception involves three questions:

> first, whether the legal means by which the evidence would have been discovered was truly independent; second, whether the use of the legal means would have inevitably led to the discovery of the evidence; and third, whether applying the inevitable discovery rule would either provide an incentive for police misconduct or significantly weaken constitutional protections.

United States v. Almeida, 434 F.3d 25, 28 (1st Cir. 2006).[5]  Here, Drouin arrested Almeida and Martin for presenting him with false identification during the initial stop.  Androscoggin County Jail, where Almeida was booked, has a policy mandating that arrestees be fully searched and their property removed.  If the search uncovers contraband, the jail routinely turns it over to the arresting officer.  Under these circumstances, the district court held that "the contents of the wallet inevitably would have been discovered and seized by an independent, lawful means when Almeida was processed at the Jail."  Almeida presents us with no persuasive reason to disagree with the district court's conclusion.

Turning to the first question involved in this analysis, the legal means of discovery in this case were "truly independent,"

---

[5]  The 2006 Almeida case is unrelated to the present case.

because Drouin had probable cause to arrest Almeida for presenting false identification (and in fact did arrest him on that basis), regardless of whether he seized the cash. Therefore the arrest and subsequent seizure of cash during the booking process at the jail would have occurred independently of the challenged seizure.

Second, the search at the jail would have inevitably resulted in the seizure of the cash, because it was the jail's policy to remove an arrestee's property during the booking process. Almeida does not dispute the existence of the policy, or claim that the policy was not regularly followed. Instead, he argues that there is "nothing 'inevitable' about the jails [sic] discovery of the bills in the wallet that initially fooled a trained detective." This argument takes the name of the exception too literally.

It is possible, of course, that the jail official might have missed what Drouin noticed, the irregular size and matching serial numbers of the counterfeit bills. But we are not looking for metaphysical certainty. The exception is applicable if there is a "high degree of probability[] that the evidence would have been discovered." Almeida, 434 F.3d at 29; see also United States v. Rogers, 102 F.3d 641, 646 (1st Cir. 1996) ("The term 'inevitable' . . . is something of an overstatement."). There is no question the bills would have been seized at the jail. The counterfeit bills might have "fooled" Drouin in the midst of conducting an arrest, but when he had the opportunity to look at

the bills without distraction, he recognized them as fake. We have no trouble concluding that there is a high degree of probability that the result would have been the same if a jail official had inspected the bills.

Third, given the particular facts of this case, the application of this exception will not "provide an incentive for police misconduct or significantly weaken constitutional protections." Almeida, 434 F.3d at 28. Drouin arrested Almeida for reasons unrelated to the seized money. At the time of the arrest, Drouin was fully aware that the jail would take Alemida's money and other property when he was booked – he testified that the money "would have went to the jail with him and I probably would have just taken it from his property there." Under these circumstances, application of the exception will not incentivize unconstitutional behavior, because the seizure of the money gave the police no particular investigative advantage. See id. at 29.

Therefore, we hold that the inevitable discovery exception applies to Drouin's seizure of the money in Almeida's wallet and affirm the district court's denial of Almeida's motion to suppress with respect to that issue.

B.      Motions in Limine

Prior to trial, the government filed a motion in limine seeking the admission of evidence related to the Oak Pond bills, which Almeida opposed. Almeida filed a motion in limine to exclude

evidence that he falsely identified himself to Drouin as Joshua Almeida during the initial stop.  The district court granted the government's motion and denied Almeida's.

We review these rulings for plain error, because Almeida did not renew his objection to the challenged evidence at trial. As we have explained:

> [i]f an <u>in</u> <u>limine</u> ruling excludes evidence unconditionally, the adversely-affected party need take no additional steps to preserve the issue for appeal, which means abuse-of-discretion review will control. But if the ruling is merely tentative and clearly invites the party to offer the evidence at trial under the ruling's terms, that party must follow up on the invitation or else plain-error review will hold sway.

<u>Rodríguez</u> v. <u>Señor Frog's de la Isla, Inc.</u>, 642 F.3d 28, 35 (1st Cir. 2011) (alterations, citations, and internal quotation marks omitted).  Here, while the rulings <u>in</u> <u>limine</u> admitted the challenged evidence, Almeida has not argued that those rulings were final rather than tentative, so Almeida's failure to renew his objection at trial triggers plain error review on appeal.  "To establish plain error, a party must show that there was error, that it was plain, and that it affected the party's substantial rights; an appellate court may then notice the error only if it seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings." <u>Long</u> v. <u>Fairbank Reconstruction Corp.</u>, 701 F.3d 1, 5 (1st Cir. 2012) (per curiam) (internal quotation marks omitted).  Almeida has not met this high standard.

-15-

### 1.  The Oak Pond Bills

Almeida claims that evidence related to the Oak Pond bills was propensity evidence inadmissible under Federal Rule of Evidence 404(b).  According to Almeida, the evidence only tends to prove that "since he apparently possessed counterfeit money on a prior occasion, he must have possessed it on the occasion of his arrest."  He argues further that "[e]ven if such evidence suggested intent . . . [it] included 'bad character or propensity as a necessary link in the inferential chain' and any probative value was substantially outweighed by the danger of unfair prejudice."

The district court questioned whether evidence of the Oak Pond bills was propensity evidence at all, suggesting that "[i]t's arguably part of the res gestae of the transaction in terms of the defendant's alleged use of certain pattern bills in relationship to what was found in the two locations."  It decided, however, that even "[i]f it is Rule 404(b) evidence, . . . it does come in under 404(b)(2) because it can be used to show evidence of [absence of] mistake or lack of accident, knowledge of what was going on[,] and I don't find any unfair prejudice under Rule 403."  We see no error at all in this decision, much less plain error.

This circuit uses a two-part test to evaluate the admissibility of evidence under Rule 404(b).  United States v. Appolon, 715 F.3d 362, 373 (1st Cir. 2013).  We determine first whether the proffered evidence has "special relevance, such as

-16-

proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Id. at 372-73 (citation and internal quotation marks omitted). "If it does, we then apply Rule 403 to ascertain whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice." Id. at 373.

The evidence of the Oak Pond bills easily satisfies both parts of the test. The existence of counterfeit bills at a separate location, bearing Almeida's fingerprints and serial numbers matching pattern bills found in Almeida's wallet, is probative of Almeida's knowledge and intent regarding the counterfeit money found in the truck – the jury could decide that this evidence weighed against the conclusion that Almeida's possession of counterfeit bills in the truck was unknowing or unintentional. Thus, we agree with the district court that this evidence has "special relevance." Id.

We also agree with the district court that this evidence is not unfairly prejudicial. As we have observed numerous times, "all evidence is meant to be prejudicial; it is only unfair prejudice which must be avoided." Id. The term "unfair prejudice" usually refers to "evidence that invites the jury to render a verdict on an improper emotional basis." United States v. Varoudakis, 233 F.3d 113, 122 (1st Cir. 2000). Almeida has not

shown anything of the sort here.  In sum, we find no error in the district court's decision to admit evidence of the Oak Pond bills.

## 2.    False Identification

Almeida also raises a Rule 404(b) challenge to the evidence related to his false identification.  He argues that he "was charged with a crime saturated in the concept of deceit.  To allow testimony regarding his provision of deceitful information . . . regarding ultimately uncharged conduct was a clear invitation to the jury to reach a conclusion based on inappropriate character evidence."

Relying on United States v. Wallace, 461 F.3d 15 (1st Cir. 2006), the district court admitted the evidence as "probative of a guilty [conscience] or consciousness of guilt."  It further explained that to the extent the evidence fell under Rule 404(b), "it would be admissible under 404(b)(2) because it does go to proof of intent and knowledge and I don't find unfair prejudice under Rule 403."  We see no error in the district court's decision.

On appeal, Almeida claims that "the 'consciousness of guilt' referred to by the trial court was consciousness of [an] uncharged motor vehicle offense and not the eventual federal charges that were not being investigated at the time he was arrested."  But Wallace forecloses this argument.  In that case, "we rejected a broad rule that would bar alias evidence whenever a defendant commits more than one crime," because "such a rule would

ignore the substantial possibility that the defendant is using the alias to evade detection for all his crimes, including the one charged."  Wallace, 461 F.3d at 26 (alteration and internal quotation marks omitted).

There was no reason in this case for the district court to prevent the jury from considering whether the false identification revealed a consciousness of guilt of counterfeiting, even if Almeida was engaged in other criminal activity at the same time.  While we have warned that such evidence "is controversial and must be handled with care," id. at 25 (alteration and internal quotation marks omitted), the district court was well aware of our admonition and offered the defense a cautionary instruction for the jury.

Under these circumstances, the district court did not err in holding that the evidence was sufficiently probative to be admissible under Rule 404(b).  Neither did it err in finding no unfair prejudice under Rule 403.  As with the evidence of the Oak Pond bills, Almeida has failed to point out any unfairness beyond the ordinary prejudice inherent in all evidence.  We therefore affirm the district court's denial of Almeida's motion in limine seeking the exclusion of evidence related to his false identification.

**C.       Sufficiency of the Evidence**

At trial, after the close of the government's case, Almeida made an oral motion for acquittal, arguing that the government had failed to meet its burden to prove Almeida's intent to defraud as required by 18 U.S.C. § 472.  The district court decided there was enough evidence of intent to go to the jury and denied the motion.  On appeal, Almeida renews his argument that the evidence presented at trial was insufficient to prove intent.  We disagree.

We review claims of insufficient evidence de novo, "considering whether the evidence, viewed in the light most favorable to the prosecution, would allow a rational jury to find all the elements of the crime beyond a reasonable doubt."  United States v. Mousli, 511 F.3d 7, 14 (1st Cir. 2007) (internal quotation marks omitted); see also United States v. Hall, 434 F.3d 42, 49 (1st Cir. 2006).  "The requisite fraudulent intent required by . . . 18 U.S.C. § 472[] may be inferred from surrounding circumstances or circumstantial evidence and thus need not be proven directly.  Courts may look to surrounding circumstances to supply inferences of knowledge which adequately prove intent."  Mousli, 511 F.3d at 16 (citations omitted); see also United States v. Silva, 742 F.3d 1, 9 (1st Cir. 2014).

There is no need to catalogue every piece of evidence presented at trial; two key points will suffice.  The government

presented evidence that Almeida possessed fourteen pattern notes that matched numerous counterfeit bills found in the truck and along Oak Pond Road. The jury could easily infer from the "number and variety of bills" that Almeida's possession of them was not unwitting or coincidental; rather he "was engaged in an ongoing effort to produce . . . fake currency with the intent of using it." Mousli, 511 F.3d at 16. The jury also heard evidence that twelve counterfeit bills with serial numbers matching the pattern bills were put into circulation in areas near where Almeida lived and vacationed. That evidence "support[s] an inference that [Almeida] had previously passed the bills in commercial transactions." Silva, 742 F.3d at 10. These facts provide sufficient circumstantial evidence of intent to sustain a conviction under 18 U.S.C. § 472.

Almeida's suggestion that the counterfeit bills were of such poor quality that he could not have intended to use them to defraud is unpersuasive. First, it directly contradicts his argument that the discovery of the counterfeit bills at the jail was not inevitable because the bills looked authentic enough to fool Officer Drouin at the scene of the arrest. But even setting that contradiction aside, there was ample evidence that the bills were of sufficient quality for a reasonable jury to infer Almeida's intent to defraud. Twelve counterfeit bills matching the pattern bills found in Almeida's possession were successfully passed around

the time of Almeida's arrest and were discovered only when the people who had accepted them in good faith presented them to banks. Moreover, even were there not "evidence [of] a high degree of likeness" between the counterfeit bills and the real ones, that would not "prevent proof by other means of intent to defraud." Mousli 511 F.3d at 16. Here, the government presented enough circumstantial evidence to allow a jury to infer Almeida's intent to defraud. Thus, we affirm the district court's denial of the motion for acquittal.

**D.        Sentencing**

Almeida attacks his fifty-one-month sentence on three fronts: the calculation of his criminal history category ("CHC"), the application of sentencing guideline enhancements to his base offense level ("BOL"), and the disparity between his sentence and that of his co-defendant, Martin. He has failed to identify any errors, however, and we therefore affirm the sentence as handed down by the district court.

**1.        Criminal History Category**

With respect to his CHC, Almeida does not contend that the district court made any factual errors in the calculation. Rather, he argues that a downward departure was appropriate in this case because the CHC "significantly over-represents his criminal history." The district court considered this argument at the sentencing hearing and came to the opposite conclusion: "I find

that the criminal history here does not overrepresent in light of the defendant's history of recurrent criminal law violations, despite sentences that have been imposed which involve custody of either small amounts or large amounts."

We review a district court's decision whether to depart from the CHC for abuse of discretion. United States v. Tavares, 93 F.3d 10, 17 (1st Cir. 1996). Here, the district court did not commit an error of any sort; it simply disagreed with Almeida about the seriousness of his criminal history. A disagreement of that nature does not approach an abuse of discretion. Accordingly, it is not grounds for reversal on appeal.

**2.      Sentencing Guideline Enhancements**

Almeida claims that the district court erred in applying enhancements to his BOL for loss in excess of $10,000 under U.S.S.G. § 2B1.1(b)(1)(C), the manufacture or production of counterfeit obligations under U.S.S.G. § 2B5.1(b)(2), and obstruction of justice under U.S.S.G. § 3C1.1. "As a general matter, we review a sentencing court's legal determinations of the Sentencing Guidelines' meaning and scope de novo and its factual determinations for clear error." United States v. Bryant, 571 F.3d 147, 153 (1st Cir. 2009); see also United States v. Doe, 741 F.3d 217, 235 (1st Cir. 2013). It is the government's burden at sentencing to prove sentencing enhancement factors by a preponderance of the evidence, and a district court may base its

determinations on "any evidence that it reasonably finds to be reliable." United States v. Walker, 665 F.3d 212, 232 (1st Cir. 2011).

Section 2B1.1 increases a defendant's BOL for various forms of theft and fraud, including counterfeiting, based on the amount of loss caused by the defendant. U.S.S.G. § 2B1.1; United States v. Appollon, 695 F.3d 44, 66 (1st Cir. 2012). As a general rule, we measure loss under § 2B1.1 as "the greater of actual loss or intended loss." Appollon, 695 F.3d at 66. "Intended loss is the loss that the defendant could have reasonably expected to occur at the time he or she perpetuated the fraud." Id. at 67.

Here, the district court imposed a four-level enhancement under § 2B1.1(b)(1)(C) for a loss greater than $10,000. It found as a factual matter that Almeida was responsible for the counterfeit money in the truck as well as the Oak Pond bills, totaling $10,270, based on his possession of the pattern bills and his fingerprints on the Oak Pond bills. These facts are a sufficient basis for the district court to infer by a preponderance of the evidence that Almeida was responsible for producing over $10,000 in counterfeit bills. It follows that Almeida could reasonably expect over $10,000 in loss to result. Therefore the court did not err in applying § 2B1.1(b)(1)(C).

Section 2B5.1 provides for a two-level enhancement "if the defendant . . . manufactured or produced any counterfeit

obligation or security of the United States, or possessed or had custody of or control over a counterfeiting device or materials used for counterfeiting." U.S.S.G. § 2B5.1(b)(2)(A). On appeal, Almeida argues primarily that pattern notes are not "a counterfeiting device or materials used for counterfeiting." The district court stated quite clearly, however, that it was "not going to rely on the possession of material used for counterfeiting, but instead that the defendant did manufacture or produce counterfeit obligations." It based this conclusion on Almeida's possession of the pattern notes and the counterfeit bills that were produced with them. Again, we find this conclusion sufficiently supported by the evidence. Thus, Almeida's challenge to the application of § 2B5.1(b)(2)(A) fails.

The third enhancement imposed by the court was two levels for obstruction of justice under § 3C1.1. That enhancement was based on the court's interpretation of the phone calls Almeida made to his wife from jail, in which he told her "all my shit needs to be thrown away." The district court reasonably interpreted this statement as an instruction to dispose of evidence. Having reviewed the transcript of the calls, we find that the district court's understanding of Almeida's statement is more plausible than the interpretation Almeida offers on appeal – that he was referring to a suitcase full of clothes that he brought with him on vacation.

Almeida also argues that he could not have been obstructing the investigation of the counterfeiting charge, because at the time of the calls he was only facing the false identification charge. But during the call recorded at 4:39 on July 6, 2011, prior to the call where Almeida told his wife to dispose of his things, his wife stated that "they had the Secret Service looking into everything and stuff like that." The district court could infer from that statement that Almeida was aware of the counterfeiting investigation at that time. In sum, the district court did not err in applying a two-level enhancement for obstruction of justice under § 3C1.1.

### 3.    Sentencing Disparity

Finally, Almeida points to the disparity between his sentence of fifty-one months and Martin's sentence of only six months. He claims that "[t]o deliver a sentence that is potentially ten times the sentence of a co-defendant is simply not reasonable." He does not fully develop an argument on this point, but we construe it as a challenge to the substantive reasonableness of the sentence. We review substantive reasonableness for abuse of discretion. United States v. Walker, 665 F.3d 212, 232 (1st Cir. 2011). "[T]he linchpin of a reasonable sentence is a plausible sentencing rationale and a defensible result." United States v. Martin, 520 F.3d 87, 96 (1st Cir. 2008).

Here, Almeida fails to offer any explanation as to why the sentences of the two co-defendants should be less disparate. Merely pointing out the disparity is plainly insufficient to establish unreasonableness. There are many valid reasons why two co-defendants might receive dramatically different sentences, and the district court expressly identified the reasons applicable in this case. Martin accepted responsibility; he was not connected to the Oak Pond bills; and he did not engage in obstruction. Under these circumstances, the district court did not abuse its discretion in sentencing Almeida to a much harsher penalty than Martin.

### III.  Conclusion

For the foregoing reasons, we **AFFIRM** Almeida's conviction and sentence.