# United States Court of Appeals
## For the First Circuit

No. 16-1770

UNITED STATES OF AMERICA,

Appellee,

v.

SHAYNE PARKER,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. F. Dennis Saylor IV, U.S. District Judge]

Before

Thompson, Selya, and Barron,
Circuit Judges.

John A. Amabile for appellant.
Alexia R. De Vincentis, Assistant United States Attorney,
with whom William D. Weinreb, Acting United States Attorney, was
on brief, for appellee.

September 19, 2017

**THOMPSON**, <u>Circuit Judge</u>.

### PREFACE

Sometime on or around March 22, 2014 — all dates here are in that year, by the way — Shayne Parker committed two legal no-nos:  he possessed 50 rounds of 38-caliber ammo while being a convicted felon, and he transported a SCCY Model CXP 9-mm pistol into his state of residence without a license.  Or so a federal grand jury in Massachusetts alleged in an indictment charging him with violating 18 U.S.C. §§ 922(g)(1) and (a)(3).  Parker pleaded not guilty.  But a trial jury found him guilty as charged.  And a district judge sentenced him to 60 months in prison and 3 years of supervised release.

Parker now appeals only his conviction, arguing that the judge triply erred — first, by not individually voir diring prospective jurors about their feelings toward race; then, by admitting evidence of other gun and ammo purchases (what we will call "other-acts evidence"); and, finally, by instructing the jury on willful blindness.[1]  Concluding that none of his challenges rises to the level of reversible error, we affirm.

---

[1] As relevant to our dispute, voir diring is a process through which "a judge or lawyer" examines "a prospective juror" to see if "the prospect is qualified and suitable to serve on a jury."  <u>See</u> *Voir Dire*, <u>Black's Law Dictionary</u> (10th ed. 2014).

- 2 -

## HOW THE CASE GOT HERE[2]

On March 21, Parker drove with Ronald Scott from Massachusetts (their state of residence) to New Hampshire and checked into the Keene Inn in Keene, New Hampshire. The room was registered in Parker's name. There they hooked up with Mitchell Riddell, a drug customer of Scott's. And Riddell talked to Scott — in Parker's presence — about buying guns.

The trio got together again the next day, March 22, this time joined by Melanie LaMott. Turns out LaMott could legally buy firearms in the Granite State and had agreed with Riddell to act as a straw buyer.[3] Parker and Scott are African-American; Riddell and LaMott are white — why this matters will become clear in the next section of this opinion.

The foursome first went to the Alstead Gun Shop in Alstead, New Hampshire. They checked out some handguns but left because Scott became uncomfortable with someone in the shop.

---

[2] Because Parker does not attack the sufficiency of the evidence against him, we describe the pertinent facts as neutrally as possible. See, e.g., United States v. Cox, 851 F.3d 113, 118 n.1 (1st Cir. 2017); United States v. Rodríguez-Soler, 773 F.3d 289, 290 (1st Cir. 2014).

[3] See *Straw Purchase*, Black's Law Dictionary (10th ed. 2014) (defining "straw purchase" as "[s]omeone's buying of a firearm for another who is prohibited to make such a purchase because of a prior conviction, an order of protection, or some similar judicially imposed proscription").

The gang then headed to the Sporting and Hunting Depot in Charlestown, New Hampshire, with Parker driving Scott in a Subaru and Riddell driving LaMott in a Toyota. After they all entered the store, LaMott bought a bunch of firearms, one of which was a SCCY Model CXP 9-mm pistol. Satisfied with the purchases, the group went to LaMott's Keene apartment, where Scott gave Riddell and LaMott crack cocaine as a partial payment for their services. Parker and Scott handled the firearms and said how pleased they were with them.

The quartet set out for Boston, Massachusetts — Riddell and LaMott in Riddell's car, and Parker and Scott in the Subaru — but stopped en route at Dick's Sporting Goods Store in Keene so Scott and LaMott could buy ammunition, including the 38-caliber ammunition. Once in Boston, Parker and Scott examined the guns and ammo. And Scott gave Riddell and LaMott the rest of the drugs they were owed for helping out.

At some point, the police caught wind of what was going on. And Parker's arrest, indictment, and conviction followed apace. As we said, his brief on appeal advances three claims of error — though all are without merit, for reasons we explain in the pages that follow.[4]

---

[4] We will note additional details as needed in discussing Parker's issues.

## INDIVIDUAL VOIR DIRE

*Background*

After Parker elected to go to trial, the parties geared up to select an impartial jury.  As part of that process, Parker's counsel asked the judge if he planned on conducting any individual voir dire.  "Only at sidebar, if someone raises [a] hand" in response to a group question, the judge said — though, he stressed, "we're not going to do individualized voir dire in the sense of . . . doing it in the lobby or doing it segregated."  But Parker's lawyer believed the judge's proposed approach would not do enough to uncover potential jurors holding racist views.  And so he pushed for individual voir dire, arguing to the judge as follows:

- As a statistical matter, the criminal-justice system treats African-Americans much harsher than others.

- The race of the cooperating straw buyers added a "cross-racial component" to the case.

- The charged ammo/firearm "offenses" also "play[ed] into a stereotype."

- One could not "realistically expect jurors to respond in the audience in front of all of the[] other prospective

jurors to questions about whether they are biased or prejudiced against people based on their race."

- And individual voir dire would better help him assess a potential juror's demeanor and thus better help him decide whether he or she had answered the judge's questions truthfully.

Relying on these reasons — offered without any evidence (like, say, a social-science study) to back them up — counsel asked the judge to ask these five questions (the bracketed numbers are ours):

[1] Do you have any feelings or opinions about black people that would cause you to question your ability to be impartial in evaluating the evidence in this case?

[2] Would the fact that Mr. Parker is a black man make it more difficult for you to decide a verdict in his favor than if he were white?

[3] Do you believe that black men are more likely to commit a crime than others?

[4] Have you had any experiences with black people that might make you unable to be fair and impartial in this case?

[5] Can you honestly assure the court that the race of the defendant will not affect your ability to be fair and impartial?

Responding to counsel's request, the judge said that it is "by no means clear" that "people will be inhibited from simply raising their hands in a crowd full of strangers without uttering a word for fear of being shamed into admitting racial prejudice,"

but "will freely admit racial prejudice to a judicial officer in a black robe with lawyers and court reporters and law clerks present."  So he denied the call for individual voir dire.  "This is a relatively routine case," the judge then stressed — "not a death penalty case, not a murder case, not a highly publicized case."  Because "[t]here's no racial angle to it" — "like a victim and a perpetrator being of different races" — and because "[n]othing about it particularly w[ould] evoke a strong emotional response or a racially charged response," the judge saw no reason "to take the highly unusual and time-consuming and resource-consuming step of individual voir dire."  Asked by the defense to reconsider, the judge adhered to his ruling — despite counsel's insistence that Donald Trump's recent victory in the Massachusetts Republican primary had "engendered serious racial polarization" and that individual voir dire would add only "a couple of extra hours" to the process.

        The judge proceeded to empanel the jury.  And per his usual practice, the judge told the prospective jurors that "[i]t is very important that you give truthful responses."  And then the judge said:

> Ladies and gentlemen, when I ask a question if you think your answer is yes or your answer is yes, please raise your hand.  If you raise your hand, I'm going to call you over here to the sidebar one-by-one.  I'll find out what the issue is.  I might explore it with you a little bit.

- 7 -

The judge started voir dire off with some basic icebreaking questions. For instance, after mentioning the names of the potential witnesses, the judge asked, "Do any of you know or are you related to . . . or acquainted" with "any of those people?" A few potential jurors raised their hands, just like the judge had asked them to do. And after calling them to sidebar, the judge asked some probing follow-up questions.

Before turning to the issue of racial bias, the judge noted that "it can be difficult sometimes for people to talk openly about [race] or to be honest or open about whatever feelings they may have on [that] subject[], but your duties and obligations as citizens and as potential jurors require you to be completely honest with me." Having said that, the judge asked the group if anyone had "any feelings of any kind that may affect your ability in any way to be fair and impartial in the trial of an African-American defendant because of his race." No one raised a hand.

At sidebar, Parker's lawyer restated his position that group questions answered with a show of hands did not suffice because "there's no way anybody is going to come forward on that." "All right," the judge said, "[o]ther than individualized voir dire, is there any particular question you want me to ask that I have not asked to the group?" Defense counsel identified two, which the judge posed to the group: "[D]o any of you believe that

- 8 -

it is more likely that the defendant is guilty of the crime because he is African-American?"  And "[h]ave any of you had an experience of any kind with African-Americans that would affect your ability to be a fair and impartial juror in the trial of this case?"  No one raised a hand in response to either question.  The judge empaneled a jury of twelve, plus two alternates.  And as seated, the jury had at least one African-American member (Parker's lawyer told us at oral argument that he "believe[d] there was one or two African-Americans" on the jury).

*Arguments*

As Parker sees it, the judge not only had to voir dire potential jurors about possible racial prejudice, but he also had an obligation to question them individually rather than collectively — and to speak with each one outside the presence of the others.  For support, Parker's brief talks about

- the "cross racial" makeup of the persons involved in the charged offenses — *i.e.*, an African-American defendant and white straw buyers;

- the "nature" of the crime, which "created inherent stereotyping with [an] African American . . . from Boston . . . preying on [white] drug addicted" New Hampshirites;

- "the statistical evidence of bias against African Americans in the criminal justice process";

- 9 -

- how the trial took place in a racially-charged atmosphere caused "by the then ongoing presidential election campaign"; and

- how one cannot expect a potential juror to cop to being a racist in front of other potential jurors.

The government counters that "the circumstances" of Parker's "case" did not require the judge to question prospective jurors about racial bias. So, the government adds, the judge actually went above and beyond what was required because he *did* quiz them on prejudice. And, the government insists, Parker has not shown that the judge's decision to question collectively rather than individually infracted any constitutional command.

*Standard of Review*

Our review of the judge's voir dire decision looks only for abuses of discretion. See, e.g., United States v. Gelin, 712 F.3d 612, 621 (1st Cir. 2013). The key "question under this standard . . . is not whether we, if sitting as a court of first instance, would have weighed the relevant considerations differently," but instead "whether our review of the record leaves us with a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." Id. (quotations and citations omitted).

- 10 -

*Analysis*

A defendant has a constitutional right to trial by an impartial jury, see U.S. Const. amend. VI — something voir dire helps safeguard by giving "the court and counsel" a chance "to examine" potential jurors "for impartiality," see Peña-Rodriguez v. Colorado, 137 S. Ct. 855, 866 (2017). And when it comes to describing the judiciary's role here, the Supreme Court has pulled no punches: "to ensure that individuals who sit on juries are free of racial bias," our "Constitution at times demands that defendants be permitted to ask questions about racial bias during voir dire." Peña-Rodriguez, 137 S. Ct. at 868 (emphasis removed). That is so because "discrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice.'" Id. (quoting Rose v. Mitchell, 443 U.S. 545, 555 (1979)).

Ever-faithful to controlling precedent, we have said that "[t]he possibility of racial prejudice" creates "special concerns" — concerns that in "certain limited circumstances" require the asking of "special voir dire question[s]." United States v. Brown, 938 F.2d 1482, 1485 (1st Cir. 1991); see also Gelin, 712 F.3d at 621. By way of example, Brown pulled two "special circumstances" cases from the U.S. Reports. One "involv[ed] a black civil rights activist whose defense to a

- 11 -

marijuana possession charge was that he had been framed by local white police."  938 F.2d at 1485 (citing Ham v. South Carolina, 409 U.S. 524 (1973)).  And the other "involv[ed] a sentencing of a black defendant who had been convicted of [the] capital offense" of killing a white storekeeper.  See id. (citing Turner v. Murray, 476 U.S. 28 (1986)).  Both are cases where "[r]ace was . . . 'inextricably bound up with the conduct of [defendant's] trial.'"  See id. (quoting Ristaino v. Ross, 424 U.S. 589, 597 (1976)).  But we have also said that voir dire "[o]rdinarily . . . need not include questions regarding racial prejudice" and that "[t]he mere fact that a defendant is black does not alone" activate "the special questioning requirement" — though we (echoing the Supreme Court) have stressed too that the better approach "'generally is to propound appropriate questions designed to identify racial prejudice if requested by the defendant,'" even in situations where it is not constitutionally required.  See id. (quoting Ristaino, 424 U.S. at 597 n.9).[5]

_____

[5] To the extent Parker claims that Peña-Rodriquez overruled these just-cited cases, his claim is off base.  Peña-Rodriguez is *not* a jury-selection case, but is instead a case involving "the no-impeachment rule" — *i.e.*, a "general rule" saying that once the jurors' "verdict has entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations."  137 S. Ct. at 861.  Peña-Rodriguez's holding is "that where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the [Constitution] requires that the no-impeachment

- 12 -

Having said all this, however, we need not referee the parties' duel over whether the judge had to ask voir dire questions to smoke out possible racial bias. And this is because even if we assume (without deciding) that he had to explore the issue during the jury-selection process, the judge did exactly that — asking (as we detailed above) the group of potential jurors not one but three questions designed to weed out racial bias (including two questions suggested by defense counsel). Fairly viewed, the judge's questions during group voir dire captured the essence of what Parker wanted asked during the hoped-for individual voir dire, even if they did not match up word for word — certainly they showed the judge's sensitivity to racial-prejudice concerns. Perhaps that is why Parker spends most of his time arguing that the judge should have done an *individual* voir dire, talking to each potential

rule give way in order to permit the trial court to consider the evidence of the juror's statement and any resulting denial of the jury trial guarantee." Id. at 869. Sure, as Parker notes, Peña-Rodriguez made powerful points aplenty, like: while "[a]ll forms of improper bias pose challenges to the trial process[,] . . . there is a sound basis to treat racial bias with added precaution." Id. But none of the cases in the above paragraph says anything to the contrary — actually, they are on the same page as Peña-Rodriguez when it comes to discussing the poisonous effects of racial prejudice on the justice system. So we may — no, *must* — follow them.

juror outside of the others' earshot.  Though forcefully presented by able counsel, his argument does not persuade.

Trial judges enjoy much discretion about how to conduct voir dire, including whether to conduct individual voir dire.  See, e.g., United States v. Pérez-González, 445 F.3d 39, 46-47 (1st Cir. 2006).  And certainly there are situations where individual voir dire makes sense.  See generally Horton v. Allen, 370 F.3d 75, 80-83 (1st Cir. 2004) (holding that defense counsel had not acted ineffectively by joining the prosecutor in requesting that the trial judge ask prospective jurors during a closed individual voir dire "about the effect that racial prejudice and pretrial publicity could have on their ability to decide the case impartially").  But no authority exists to support Parker's theory — floated during oral argument — that if the case facts suggest the judge should voir dire on race, then only an *individual* voir dire will do.  On the contrary, in cases where "the subject of possible racial bias must be 'covered' by the questioning of the trial court in the course of its examination of potential jurors," the Supreme Court has been "careful not to specify the particulars by which this could be done" — noting, for example, that it has "not . . . require[d] questioning of individual jurors about facts or experiences that might have led to racial bias."  See Mu'Min v. Virginia, 500 U.S. 415, 431 (1991).  And as the government tells

- 14 -

us — without contradiction from Parker — the only circuit to squarely consider the issue before us held that, "ordinarily, questioning jurors as a group" is constitutionally sufficient, "even when the defendant belongs to a racial, ethnic, or religious minority and juror bias on one or more of these grounds might be a concern." See United States v. Hosseini, 679 F.3d 544, 555 (7th Cir. 2012).

Trying to convince us that his case is anything but ordinary, Parker turns to a concurrence in a nearly 30-year-old Eleventh Circuit opinion, Berryhill v. Zant, 858 F.2d 633 (11th Cir. 1988) — a habeas case involving a crime that caused a torrent of pretrial publicity. Unfortunately for Parker, the Berryhill concurrence is not a difference-maker here.

To over-simplify (slightly) for present purposes, the district judge there concluded that a state court's decision to deny Berryhill's request "for a sequestered" individual voir dire violated his fair-trial rights. Id. at 640-43. In taking this issue on (the majority did not speak to that subject because it affirmed the grant of habeas relief on other grounds), the concurrence quoted the district judge, who said — and this is the money quote as far as Parker is concerned — that the "*inhibiting effect of a large audience . . .* made a careful and probing voir dire all the more important." Id. at 641 (Clark, J., specially

- 15 -

concurring) (emphasis added).  Agreeing with the district judge that the state court's voir dire had not done enough to uncover the possible influence of pretrial publicity, the concurrence suggested that at any new trial, the state court should do a general group voir dire on the pretrial-publicity issue (asking them whether they had read or heard anything about the case, for example) and then do "an individualized segregated voir dire" if necessary.  Id. at 642-43 (Clark, J., specially concurring).  A "sequestered individual voir dire," the concurrence stressed, would prevent "those prospective jurors who had not read or heard about the case" from being "contaminat[ed]" by "the responses of those who had."  Id. at 642 (Clark, J., specially concurring).

As we understand his brief, Parker is claiming that the "inhibiting effect" concept gives some oomph to his core contention that people will not answer race questions honestly during a group voir dire.  Like the concurring judge in Berryhill, we do not doubt that the "inhibiting effect" concern makes a diligent and thoughtful voir dire a must.  But again, that is precisely what our judge did here.  And his voir dire procedure — questioning jury prospects about race as a group (prospects who had already shown a willingness to raise their hands, mind you) and allowing for individualized follow-up questions at sidebar if necessary — jibed with the procedure recommended by the Berryhill concurrence.

- 16 -

Which is why this out-of-circuit opinion is not the game-changer that Parker thinks it is.

Summarizing succinctly, given the particulars of Parker's case, we believe that the tack taken by the experienced judge passes the abuse-of-discretion test with room to spare. See generally Pérez-González, 445 F.3d at 46 (noting that "[w]hile we have endorsed the concept of individual questioning in high profile cases, we have approved 'group' questioning of potential jurors about bias as within the district court's broad discretion in conducting voir dire" (citations omitted)). Enough said on the voir-dire issue.

## OTHER-ACTS EVIDENCE

### *Background*

Before the trial kicked off, the government moved in limine seeking permission to introduce evidence of gun and ammo purchases beyond the ones that formed the bases of the indictment's counts. Zeroing in on other straw buys that went down on March 22, as well as buys that occurred on March 10 and 16 (more on these in a bit), the government argued, first, that this other-acts evidence showed Parker's "knowledge and intent to transport and receive the firearms in the state of Massachusetts," and, second, that the other-acts evidence's probative worth outweighed any unfairly prejudicial effect. Parker opposed the motion.

- 17 -

Having gotten the green light from the judge, the government introduced evidence at trial that on March 10, Parker and Scott got the straw purchasers to buy multiple firearms at the Alstead Gun Shop: Parker drove Scott in the Subaru to New Hampshire, where they met with Riddell and a woman named Sandra Egbert. Scott gave Riddell money and general instructions on what guns to buy. The four — Parker, Scott, Riddell, and Egbert — entered the store. Egbert bought three guns. At some point, the guns ended up in the Subaru. And Parker said that he really liked one of them — "a silver and black SCCY 9 millimeter handgun" — and that he wanted to buy "more like it."

The government also introduced evidence of the straw purchases that happened less than a week later, on March 16: Before the buy, Parker and Scott headed to New Hampshire and stayed at the Keene Inn in a room registered to Parker. They met with Riddell and LaMott. Parker again said that he wanted more "SCCY" guns. And using Scott's money, LaMott then bought three firearms (one of which was an "SCCY" handgun) at the Sporting and Hunting Depot in Charlestown. After stopping at LaMott's Keene apartment, the group drove to Boston (Riddell drove LaMott in his car). Parker handled the guns back at the Boston apartment. And Riddell and LaMott returned to New Hampshire after getting crack cocaine as payment for their services.

And, finally, the government introduced evidence of the March 22 gun buy — one that occurred contemporaneously with the purchase of the SCCY Model CXP 9-mm pistol that was the subject of the indictment: At the Sporting and Hunting Depot, Parker told Riddell that he and Scott wanted an assault rifle hanging on the wall. And Parker and Scott then gave Riddell money to buy the weapon. LaMott made the purchase (again, at the same time she bought the SCCY Model CXP 9-mm pistol). And later that day, LaMott and Scott bought ammo at Dick's Sporting Goods Store in Keene.

Importantly, at various points in the trial the judge instructed the jury regarding the purposes for which the other-acts evidence was introduced. Here is a perfect example of the kind of instructions he gave (the judge gave this one the first time he admitted the evidence):

> I'm permitting you to hear evidence of . . . transactions [beyond those underlying the indictment] for the purpose of permitting you to evaluate that evidence for whatever weight you choose to give it in considering [Parker's] intent, motive, knowledge, whether he had a particular plan, but, again, this is not charged conduct.
>
> . . . [Y]ou must take special care to ensure that you do not consider this evidence as evidence that [Parker] has a bad character or somehow is a bad person, and, therefore, committed the crime.
>
> You must evaluate the charged crime[s] according to their own evidence and not because of whatever character [Parker] does or does not have.

Hard on the heels of this instruction, the judge — at defense counsel's request — told the jury that "another way of framing . . . the same concept is you may not conclude that [Parker] had a propensity to commit a crime and, therefore, committed the crime, that he acted in accordance with bad character, so to speak."  And to give another example, in his final jury charge the judge gave this reminder:

> You've heard evidence that [Parker] may have committed acts similar to those charged in this case on one or more different occasions.  You may consider that evidence only for the limited purposes of deciding:

> Whether [he] had the necessary intent, knowledge, or state of mind to commit the crimes charged in the indictment;

> Whether [he] had a motive or opportunity to commit the crimes charged; or

> Whether [he] acted according to a plan to commit the crimes charged.

> You may not use that evidence for any other purpose. In particular, you may not use it to infer that, because of his character, or because he has a propensity to act in a certain way, [he] committed the crimes charged.

*Arguments*

Parker thinks the judge reversibly erred here because (by his lights) the "uncharged crimes" evidence constituted "prejudicial" other-acts evidence that the government used to fill lots of trial time merely to portray him as bad man, thus "creating [a] significant risk" that the jury convicted him "based on his

propensity to commit a crime."[6]  The government thinks the
opposite, saying the judge rightly ruled that the evidence had
non-propensity purposes, chiefly to establish Parker's knowledge
and intent.  And, the government writes, the evidence "was also
not unfairly prejudicial" to Parker — particularly given the
judge's "deftly and timely deployed limiting instructions," which
"eliminated any potential for unfair prejudice."  Wrapping up, the
government says that if error occurred it was harmless given the
considerable "uncontested evidence of Parker's guilt."

*Standard of Review*

Our review of the judge's decision to admit other-acts
evidence is for abuse of discretion only.[7]  See, e.g., United
States v. Munyenyezi, 781 F.3d 532, 539 (1st Cir. 2015); United
States v. George, 761 F.3d 42, 58 (1st Cir. 2014).  And convincing
us that the judge abused his discretion takes no small effort.
See United States v. Hadfield, 918 F.2d 987, 995 (1st Cir. 1990).
We say that because "[o]nly rarely — and in extraordinarily

---

[6] Parker calls the evidence "irrelevant" in part of a sentence
buried in the summary-of-the-argument section to his brief, but
then does nothing to elaborate on it.  So we hold any potential
relevance-based argument waived for lack of development.  See,
e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

[7] The parties agree (at least implicitly) that Parker's
counsel did enough below so that this issue gets abuse-of-
discretion (and not simply plain-error) review.  And we have no
basis to conclude otherwise.

- 21 -

compelling circumstances — will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." Id. (quoting Freeman v. Package Mach. Co., 865 F.2d 1331, 1340 (1st Cir. 1988)).

*Analysis*

No one doubts that prosecutors can offer evidence of uncharged crimes so long as the evidence goes to proving something other than the defendant's bad character, like proving his intent or knowledge. See Munyenyezi, 781 F.3d at 539 (citing Fed. R. Evid. 404(b)(2)); see also Rodríguez-Soler, 773 F.3d at 297 (noting that the list of permissible purposes "is illustrative, not exhaustive"). But even then, the judge can keep the evidence out if its potential for unfair prejudice "substantially outweigh[s]" its probative worth. See Fed. R. Evid. 403; see also United States v. Zeuli, 725 F.2d 813, 816 (1st Cir. 1984) (explaining that if other-acts evidence is probative of some issue other than character, "it is admissible, subject only to the rarely invoked limitations of Rule 403"). With these preliminaries out of the way, we can dispose of Parker's claim quickly enough.

The government is exactly right that prosecutors used the other-acts evidence not to show Parker's bad character but to show his intent and knowledge. Take the other-acts evidence of

the March 22 purchases.  Parker's expressing an interest in the assault-style rifle, giving money to help buy it, and handling it back in Boston (on the very day of the charged criminal purchases) showed his awareness of — and his participation in — the group's gun/ammo-purchasing project.  Ditto for the other-acts evidence of the March 10 and 16 purchases, since those other acts not only occurred just before the charged acts, they also closely allied with the types of crimes Parker was on trial for — similarities include stays at the Keene Inn, in a room registered to Parker; the shuttling of guns and ammo from New Hampshire to Massachusetts; and the giving of drugs to straw buyers as payment for their services.  All of this showed that Parker was a knowledgeable scheme member and not simply an "unknowing" innocent. See United States v. Aguilar-Aranceta, 58 F.3d 796, 798-99 (1st Cir. 1995) (stressing that if the evidence might admit of an innocent "explanation" and the parties dispute the defendant's "intent and knowledge," the judge has the "discretion to permit the government to introduce evidence of prior similar offenses to demonstrate the unlikeliness that the defendant was merely an innocent and unknowing bystander"); see also Hadfield, 918 F.2d at 994 (collecting cases upholding the admission of a defendant's prior

involvement in similar illegal activities "to prove knowledge and intent").[8]

And prejudicial though it was — nearly all evidence is prejudicial, "by helping one side and hurting the other" — the complained-of other-acts evidence (admitted for the perfectly permissible purpose of showing Parker's knowledge and intent) was not unfairly prejudicial. See Rodríguez-Soler, 773 F.3d at 296 (discussing how Rule 403 works). Parker tries to establish unfair prejudice by suggesting that the other-acts evidence ate up too much court time. But the record shows that in this 5-day trial involving 15 witnesses, testimony about the gun-and-ammo purchases came from just 2 testifiers, Riddell and LaMott. Also, the judge's limiting instructions on the proper use of the other-acts evidence — crafted with defense counsel's input, mind you — did enough to reduce any possible prejudice. See, e.g., United States v. Moon,

---

[8] Parker talks up a non-binding (and un-appealed) district court opinion, United States v. Da Lin, 707 F. Supp. 2d 158 (D. N.H. 2010), hoping against hope that we might see the other-acts-evidence issue his way. Among other things, the district judge in Da Lin found "insufficient evidence to determine whether the prior conduct" at issue there "was 'sufficiently similar' to that alleged in the pending charges to 'allow a juror to draw a reasonable inference probative of knowledge and intent.'" Id. at 162 (quoting United States v. Landrau-Lopez, 444 F.3d 19, 24 (1st Cir. 2006)). Compare Da Lin to our case and the difference is night and day, given our conclusion that the similarity between the uncharged and charged conduct here had probative value in establishing Parker's knowledge and intent. So Da Lin helps Parker not at all.

- 24 -

802 F.3d 135, 144-45 (1st Cir. 2015), <u>cert. denied</u>, 137 S. Ct. 830 (2017); <u>United States</u> v. <u>Manning</u>, 79 F.3d 212, 217 (1st Cir. 1996).

The long and the short of it is that the judge did not abuse his discretion by admitting the other-acts evidence.[9]

Two issues down, one to go.

## WILLFUL-BLINDNESS INSTRUCTION

### *Background*

At a charge conference held before the close of evidence, the judge asked the parties if he should give a willful-blindness instruction and if so, why.

The prosecutor responded that yes, the judge should give the charge. For support, the prosecutor pointed to Parker's post-arrest statement to law enforcement that Scott had paid him $200 "like three times" to drive him to New Hampshire but that "each time, when we stayed in the hotel, when we came back to Boston, the only thing we came back with was marijuana." Parker added that he "didn't want to know" what else Scott was up to — and though Scott once went to the car to get "stuff," a word Parker took to mean guns, Parker claimed that he left the room because he "didn't want to know about nothing." According to the prosecutor, Parker's comments show "that he's willfully blind by attempting to

---

[9] Given this conclusion, there is no need for a harmless-error analysis.

- 25 -

close his eyes to the conduct." "I think it's fairly presented in the evidence or it certainly will be when the government introduces [the] statement tomorrow," the prosecutor stressed.

Parker's lawyer saw things differently, to put it mildly. The government does not "have to" put Parker's statement in evidence, counsel said. "We're not putting any evidence in" on the lack-of-knowledge issue, he added. And, he noted, the prosecutor "can't put [the statement] in and then say I want to get a particular instruction that otherwise would be inappropriate." Focusing on the proposed instruction's language, counsel complained that the judge could not use it because it would have "the effect of shifting the burden of proof" on the questions of Parker's knowledge and intent.

The judge reserved ruling on the matter, saying he wanted to see what Parker said, "assuming [the statement] comes in." "I'm going to go back and look at the case law on willful blindness, when it's appropriate and when it isn't and give some more thought to it," the judge added. The next day, the judge told the parties that he intended to give a willful-blindness instruction. Regardless of whether Parker claims a lack of knowledge, the judge ruled, his statement — if it is as represented by the government — "suggest[s] a conscious course of deliberate ignorance," and the charge "as drafted does not suggest in any way that an inference

of knowledge is mandated." Later that morning, the government —
without objection — introduced the statement.

The government rested its case that same day. The
defense, in turn, rested too — without calling any witnesses. The
attorneys then made their closing arguments. And the judge gave
the final charge to the jury.

Pertinently for our purposes, the judge instructed the
jury that it "may infer" Parker "had knowledge of a fact if" it
found Parker "deliberately closed his eyes to a fact that otherwise
would have been obvious to him." "[T]o make such an inference,"
the judge explained, the jury had to "find two things: [f]irst,
that [Parker] was aware of a high probability of the fact in
question; and, [s]econd, that [he] consciously and deliberately
avoided learning that fact — that is to say, he willfully made
himself blind to that fact." And, the judge emphasized, whether
Parker "deliberately closed his eyes to [a] fact, and, if so, what
inference, if any, should be drawn," was "entirely up to you."
Also, the judge cautioned the jury that Parker "must have
consciously and deliberately avoided learning the fact" — neither
"[m]ere negligence, recklessness or mistake in failing to learn
the fact," nor "[t]he fact that a reasonable person in [Parker's]
position would have known the fact," sufficed. Plus, the judge
warned that a finding that Parker "made himself willfully blind to

- 27 -

one or more facts" was not alone "sufficient to find him guilty of a crime." Rather, the prosecution had to "prove[] all of the elements of the crimes as charged in the indictment" — something the judge stressed after referring to Parker's presumption of innocence and the prosecution's burden to prove beyond a reasonable doubt the elements of each offense.

Parker's attorney renewed his objection to the willful-blindness instruction after the judge gave the charge.

*Arguments*

Parker writes that the judge should not have given a willful-blindness instruction because (a) he "introduced no affirmative evidence" of his "lack of knowledge"; (b) the evidence "did not suggest a conscious course of deliberate ignorance" on his part; and (c) the charge relieved the government of its burden to prove his "knowledge" of the illegal scheme. For its part, the government argues that Parker waived the claim by not properly developing it in his appellate papers. If not waived, says the government, his argument is dead wrong on each front. And on top of that, the government claims that even if the evidence did not justify a willful-blindness instruction, any error was harmless because "the evidence was sufficient for the jury to find that Parker had actual knowledge of the firearms purchase scheme."

Some older cases — as the government suggests — imply that uncertainty surrounds what standard of review applies in assessing a judge's decision to give a willful-blindness instruction. See United States v. Appolon, 695 F.3d 44, 63 (1st Cir. 2012). But recent cases have brought clarity to this area, explaining, for example, that the standard of review depends on the nature and circumstances of the particular claim of error. See United States v. De La Cruz, 835 F.3d 1, 12 (1st Cir. 2016). Here, as we said a second ago, Parker's claims turn on whether the trial evidence supported a willful-blindness instruction and on whether the issued instruction relieved the government of its burden to prove his knowledge. And given our current caselaw, these claims demand de novo review. See id.; see also United States v. George, 841 F.3d 55, 65 (1st Cir. 2016).

*Analysis*

Because we can uphold the judge's willful-blindness charge on the merits, we need not decide whether Parker waived the issue because of inadequate briefing. To the merits then.

Lots of "criminal statutes require proof that a defendant acted knowingly," our judicial superiors tell us. Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 766 (2011). But willful blindness is tantamount to knowledge. See United

States v. Rivera-Rodríguez, 318 F.3d 268, 272 (1st Cir. 2003). And when applied, the so-called willful-blindness doctrine lets prosecutors prove a defendant's knowledge by showing that he "deliberately shield[ed] [himself] from clear evidence of critical facts that are strongly suggested by the circumstances." Global-Tech Appliances, Inc., 563 U.S. at 766. An oft-repeated rationale for the doctrine is that one who acts like that is "just as culpable" as one who has "actual knowledge" — in other words, "persons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts." Id.

A willful-blindness instruction is appropriate only when (a) the defendant alleges he lacked knowledge, (b) the evidence — examined in the light most flattering to the prosecution — shows he deliberately closed his eyes to the true facts, and (c) the instruction, viewed in context, does not suggest that an inference of knowledge is required rather than permitted. See, e.g., United States v. Azubike, 564 F.3d 59, 66 (1st Cir. 2009); United States v. Singh, 222 F.3d 6, 11 (1st Cir. 2000). We address each part of this test in turn.

As for part (a), Parker's big argument is that he offered "no affirmative evidence" of his "lack of knowledge." True, Parker never testified at trial and so did not put his lack of guilty

- 30 -

knowledge directly in issue. But "that circumstance is not dispositive." Singh, 222 F.3d at 11. Our cases have made crystal clear that part (a) "of the test for a willful blindness instruction does not depend on a showing of an explicit denial of guilty knowledge out of the defendant's own mouth" — what matters is whether "a practical evaluation of the record reveals that the defense was pitched in that direction." Id. And that is the case here.

To begin, Parker's post-arrest statement — admitted into evidence without objection — suggests an attempt on his part to convince the authorities that he had no idea what the people around him were doing. And Parker offers no developed argument as to why the judge could not rely on this evidence in his willful-blindness ruling. More, the trial transcript shows that Parker staked his defense on convincing the jury that he did not personally buy or transport the firearms, and was not there when others bought or talked about them — a defensive theme reflected by his counsel's questions on cross-examination and by his counsel's comments during closing arguments.[10] And as the government's brief notes,

_____

[10] To take only one of the examples, defense counsel said during closing that Parker "didn't buy any firearm, he didn't transport it, it was never at his home." And even though a fingerprint matching Parker's was found on an ammunition package, counsel claimed that "[t]here's no credible evidence" that Parker ever "touched" the ammo — or for that matter, the gun. Riddell

- 31 -

Parker's team implemented this strategy in the hopes of persuading jurors that he had zero knowledge of what Scott, Riddell, and LaMott were up to — a point Parker does not contest in his reply brief.

Parker fares no better under the part (b) of the test. The government offered direct evidence that he consciously averted his eyes to the group's illegal escapades. We are again talking about Parker's post-arrest statement in which he claimed that he "didn't want to know about nothing" and that he left the room when Scott went to the car to bring the guns into the Boston apartment (Scott had said that he was going to get "stuff," but Parker knew "stuff" meant "guns"). That is enough to satisfy this part of the test. See United States v. Brandon, 17 F.3d 409, 452 (1st Cir. 1994) (finding no error in giving a willful-blindness instruction where the defendant said he "didn't want to know anything about" a "scheme to fraudulently represent the existence of down payments").

Finally, regarding the test's part (c), Parker makes no effort to explain why he thinks the judge's willful-blindness instruction mandated an inference of knowledge. Maybe that is because the judge took care to avoid giving the impression that

_____

made "stuff up" — saying Parker did "this" or "that" — to curry favor with the authorities, counsel stressed.

such an inference was mandatory rather than permissive.  Recall,
for example, how the judge told the jurors that it was "entirely
up to you to determine whether [Parker] deliberately closed his
eyes to [a] fact, and, if so, what inference, if any, should be
drawn."  Add to this the other parts of the judge's final charge
(highlighted above) and we think Parker's claim that the
instruction improperly implied that a guilty-knowledge inference
was obligatory is a no-go.  See Singh, 222 F.3d at 11 & n.4
(approving a nearly identical willful-blindness instruction);
United States v. Gabriele, 63 F.3d 61, 66-67 & n.6 (1st Cir. 1995)
(same); Brandon, 17 F.3d at 451-52 & n.72 (same).

The bottom line is that we see no reversible error with
this aspect of the case.[11]

## FINAL WORDS

Our work over, we *affirm* Parker's conviction.

---

[11] Given our holding, we need not take on the government's
other theories for why we should affirm the judge's instruction.