# United States Court of Appeals
## For the First Circuit

No. 16-2334

UNITED STATES OF AMERICA,

Appellee,

v.

JAQUAN CASANOVA, a/k/a Cass, a/k/a Joffy, a/k/a Joffy Joe,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

Before

Lynch, Stahl, and Kayatta,
Circuit Judges.

Chauncey B. Wood, with whom Eva Jellison, Meredith Shih, and Wood & Nathanson, LLP were on brief, for appellant.
Randall E. Kromm, Assistant United States Attorney, with whom William D. Weinreb, Acting United States Attorney, was on brief, for appellee.

March 26, 2018

**LYNCH**, **Circuit Judge**.  After an eight-day jury trial, Jaquan Casanova was convicted of tampering with a witness (Darian Thomson) by attempting to kill him (and almost succeeding), in violation of 18 U.S.C. § 1512(a)(1)(C), and of making false statements to a federal agent, in violation of 18 U.S.C. § 1001.

On appeal, Casanova asks this court to reverse his conviction and raises three unpreserved claims of error, described below.  We affirm.  We reiterate that criminal defendants do not ordinarily have a right to individual voir dire of every prospective juror as to potential racial bias, whether in lieu of or in addition to group voir dire.  See United States v. Parker, 872 F.3d 1, 8 (1st Cir. 2017).  Here, the district court individually questioned at sidebar any prospective juror who had expressed racial bias during group voir dire.  There was no plain error.

I.

We recount the relevant facts "in the light most favorable to the verdict."  United States v. Van Horn, 277 F.3d 48, 50 (1st Cir. 2002) (citing United States v. Escobar-de Jesus, 187 F.3d 148, 157 (1st Cir. 1999)).  On the evening of April 30, 2013, Boston police officers investigating a report of a gunshot in Dorchester, Massachusetts found a man later identified as Darian Thomson in the driver's seat of a parked car, bleeding from a head wound.[1]  The individual who had alerted the authorities, Shaqukurra Thomas,

_____

[1]    Thomson survived, but was left permanently disabled.

reported that she had been in the passenger's seat when Thomson was shot. In an interview with investigators later that evening, and again at Casanova's trial, Thomas recounted the events leading up to the attack. Her account at trial was supplemented by the testimony of two other witnesses: Anthony Harris and Jacquelyn Lungelow.

On the afternoon of April 30, Thomas met with Thomson, whom she had first met a few days earlier. After driving around Dorchester and Mattapan for a few hours, the two of them visited Raymond Jeffreys, purportedly Thomson's "friend[]," at Jeffreys's apartment in Roxbury. There, Thomson and Thomas briefly socialized with Jeffreys, Lungelow, Harris, and Casanova -- none of whom Thomas had previously met.

Jeffreys led a multi-state sex-trafficking organization, a drug-dealing business, and a fraudulent check-cashing operation. Lungelow was a prostitute who worked for Jeffreys at the time. Harris was Jeffreys's childhood friend. Casanova was longtime friends with Harris and Jeffreys, occasionally sold drugs for Jeffreys, and had reportedly told Harris that he would "do anything for [Jeffreys]." As for Thomson, he ran a sex-trafficking operation of his own, but at times partnered with Jeffreys and shared information with him. Earlier in 2013, Jeffreys had told Harris and others that he suspected Thomson was a "rat," i.e., a government informant, who was "snitching" on him.

At Jeffreys's apartment, Harris saw Jeffreys and Casanova talking in the kitchen and observed Jeffreys pat his waist, raise

his left arm, and make a shooting motion with his hand. Shortly thereafter, Jeffreys asked Thomson to take Harris to McDonald's. Thomson drove Thomas, Harris, and Casanova to a nearby McDonald's in Dorchester, and Harris went inside to order food. When Harris returned, Casanova stated that he wanted to "pick up something from his boy" and instructed Thomson to park the car at an intersection nearby. Casanova then got out of the car, shot Thomson through the driver's seat window, and fled from the scene with Harris.

Thomas did not know, and was initially unable to identify, any of the individuals involved in the shooting other than the victim. On May 1, she was presented with a photo array that did not contain pictures of any of the defendants; she did not identify anyone in the array. That same day, Jeffreys was questioned by investigators and admitted that Thomson had visited his apartment on the afternoon of April 30th and had left with a woman and two men, but he claimed that he did not know their identities. The investigation continued.

Nearly two years later, the police presented Thomas with a second photo array. Thomas stated that one of the photographs, depicting Casanova, looked somewhat like the shooter, but she expressed doubt because she recalled the shooter as having a tattoo on his neck whereas Casanova's picture did not show any tattoo. When Casanova was interviewed by law enforcement in January 2015, "he denied knowing Jeffreys well, denied having seen Jeffreys since 2011, and denied knowing where Jeffreys lived in 2013."

Investigators ultimately concluded that Casanova was the shooter and that Harris was the man who had accompanied him in the back seat of Thomson's car. Security footage from the McDonald's to which Thomson had driven on the night of the shooting showed a man matching Thomas's description entering the restaurant and interacting with an employee. That employee identified Harris as the man in the surveillance video. Harris, testifying at trial pursuant to an immunity agreement, in turn identified Casanova as the individual who had traveled to the McDonald's with him, Thomson, and Thomas, and as the individual who later shot Thomson. Lungelow corroborated Harris's account, testifying that Jeffreys had told her on the evening of April 30th that Casanova and Harris had "handled the situation" by shooting Thomson because he was "ratting." Finally, forensic investigators analyzed prints collected from certain items recovered from the inside of Thomson's car the day after the shooting, and determined that some belonged to Harris and one belonged to Casanova.

On April 16, 2015 a grand jury returned a twenty-five count third superseding indictment charging Casanova, Jeffreys, and Corey Norris (a friend and associate of Jeffreys) with multiple crimes. Norris and Jeffreys faced various counts of sex trafficking and related offenses. The indictment charged Casanova and Jeffreys with tampering with a witness by attempting to kill Thomson, in violation of 18 U.S.C. § 1512(a)(1)(C), and conspiracy to engage in the same, in violation of 18 U.S.C. § 1512(k), and charged Casanova with making

false statements to a federal agent regarding his relationship with Jeffreys, in violation of 18 U.S.C. § 1001. Norris and Jeffreys pled guilty and were sentenced to fifteen and thirty years' imprisonment, respectively.

Casanova went to trial. The jury found him guilty of witness tampering and making false statements, but acquitted him on the conspiracy count. Casanova was sentenced to twenty-eight years' imprisonment and five years of supervised release. He now appeals and asks this court to vacate his conviction and remand for a new trial.

## II.

Casanova makes three claims of error: that (1) the district court violated his Sixth Amendment right to a fair and impartial jury trial when it failed to individually question all prospective jurors about potential racial bias; (2) the government's fingerprint expert made a prejudicial false statement exaggerating the accuracy of fingerprint analysis as a method of forensic identification; and (3) the district court violated Federal Rule of Evidence 403 when it allowed the government to introduce prejudicial testimonial evidence as to Jeffreys's physically abusive treatment of the prostitutes who worked for him.

Casanova did not preserve any of his claims, and thus our review is for plain error. Casanova "must show that (1) an error occurred, (2) the error was obvious, (3) the error affected

substantial rights, and (4) the error seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Espinal-Almeida, 699 F.3d 588, 600 (1st Cir. 2012) (citing United States v. Delgado-Hernández, 420 F.3d 16, 19-20 (1st Cir. 2005)).

## A.  Voir Dire

Casanova first challenges the district court's failure to individually question every prospective juror about racial bias after at least one juror at sidebar professed to harbor such prejudice despite not having revealed that prejudice during group voir dire.

Before trial, the parties filed lists of proposed questions they wished the court to ask during voir dire.  Casanova did not submit any question pertaining to racial bias.  On the first day of jury selection, the court asked defense counsel if he "wanted [the court] to ask a racial bias question."  Defense counsel assented, without making any suggestions or requests regarding the form or substance of the court's questioning.

At the start of voir dire, the court addressed the entire pool of prospective jurors and explained that it would ask them a series of questions.  The court instructed the group of jurors to stand up to answer "yes," and informed them that anyone who did so in response to any question would be subsequently questioned at sidebar.  The court then asked the group of jurors questions on various topics. When it reached the topic of racial bias, the court stated that

Casanova was African American and admirably noted, "[i]t is difficult sometimes in our society for people to talk openly about issues such as race or racial bias or prejudice . . . but your duties and obligations as citizens and as potential jurors in this case require your complete honesty and candor." The court followed up with two questions to the group: (1) whether any juror had "any feelings of any kind that may affect [his or her] ability in any way to be a fair and impartial juror in the trial of an African American defendant," and (2) whether any juror "fe[lt] that the defendant, Mr. Casanova, [was] more likely to have committed the offenses charged against him because of his race." Three jurors (Nos. 7, 67, and 70) stood up to the first question; none to the second.

Once it finished questioning the jury pool as a group, the court individually interviewed those jurors who had provided affirmative responses. With respect to the three jurors who had acknowledged potentially harboring racial prejudices, the court questioned Juror 7 but filled all juror slots before reaching Jurors 67 and 70. Juror 7 explained that he was concerned about the large number of African Americans in prison, and felt that "something needs to be done" about it. In addition, two other jurors, who had answered affirmatively to questions unrelated to racial bias, made statements at sidebar that touched upon race. Juror 28, who indicated she had previously been involved with the criminal justice system, explained at sidebar that her daughter had been hit by a car and that the driver

had been criminally charged. When asked whether she thought the incident would affect her impartiality as a juror in Casanova's case, she responded, "I would like to think I hate the person and not the color of his skin, so I think I could be impartial." Juror 34, who had responded to multiple voir dire questions, volunteered at sidebar that he harbored racial prejudice: he acknowledged that he "ha[d]n't been the same since they let OJ Simpson go," and added that he had not responded to the court's group questions regarding racial bias because he "didn't want to be embarrassed by it." The court excused Jurors 7, 28, and 34.

Casanova argues that the district court's reliance on group voir dire as a mechanism for exposing prospective jurors' potential racial biases was inadequate to safeguard his right to an impartial jury. He argues that the court instead should have individually questioned each prospective juror regarding whether they harbor any such prejudice. This court reviews a district court's conduct of voir dire for abuse of discretion, see United States v. Gelin, 712 F.3d 612, 621 (1st Cir. 2013), but where the defendant failed to object contemporaneously to the district court's procedure, we review only for plain error, see Espinal-Almeida, 699 F.3d at 600. At no point during the jury selection process did Casanova request that the court individually question the prospective jurors regarding racial bias. Accordingly, plain error review applies.

Casanova's attempt to establish plain error is foreclosed by United States v. Parker, 872 F.3d 1 (1st Cir. 2017). Parker squarely rejected the categorical "theory . . . that if the case facts suggest the judge should voir dire on race, then only an individual voir dire will do." Id. at 8.[2] To the contrary, the court emphasized that

> where "the subject of possible racial bias must be 'covered' by the questioning of the trial court in the course of its examination of potential jurors," the Supreme Court has been "careful not to specify the particulars by which this could be done" -- noting, for example, that it has "not . . . require[d] questioning of individual jurors about facts or experiences that might have led to racial bias."

Id. (quoting Mu'Min v. Virginia, 500 U.S. 415, 431 (1991)); see also United States v. Hosseini, 679 F.3d 544, 555 (7th Cir. 2012) (holding that "ordinarily, questioning jurors as a group" is constitutionally sufficient "even when the defendant belongs to a racial, ethnic, or religious minority and juror bias on one or more of these grounds might be a concern").

Casanova makes two attempts at distinguishing Parker. First, he argues that the district court here had actual evidence that the group voir dire was inadequate at ferreting out racial bias because one juror disclosed harboring such prejudice at sidebar after

---

[2]      We need not address the parties' disagreement as to whether the court's inquiry into racial prejudice in Casanova's case was constitutionally mandated. If group voir dire suffices when the inquiry into racial bias is mandatory, then a fortiori it suffices when the inquiry is performed at the court's discretion.

- 10 -

remaining silent during group questioning. Second, he argues that his case is particularly "racially charged" because he was charged with a violent offense (attempt to kill) and the trial evidence showed that one of his alleged co-conspirators had abused white prostitutes, whereas in Parker the defendant was charged with a non-violent crime (possession of a firearm) and there was, in Casanova's words, no "cross-racial perpetrator-victim dynamic."

As to Casanova's first argument, we reject the proposition that upon discovering that a prospective juror was not forthcoming during group voir dire, a district court is required to conduct an individualized inquiry as to racial bias for every other juror in the pool. Such a rule would impose a potentially significant burden on the court and on jurors. It would also withdraw defense counsel's discretion to decide, as a tactical matter, whether to ask the court for individual voir dire and so provide the prosecution the opportunity to challenge any jurors who would -- at sidebar but not before their peers -- disclose a pro-defendant bias. In Casanova's case, the evidence of racial bias in the jury pool cut both ways. Juror 7 disclosed bias favoring the defendant, whereas Juror 34 disclosed bias against the defendant.

And in any event, the fact that one or more jurors who are not forthcoming during group voir dire later reveal a prejudice does not render it any more likely that the remaining members of the jury pool harbor hidden prejudice. It cannot be that, as Casanova would

have us find, group voir dire is generally constitutionally satisfactory but is rendered infirm whenever a juror discloses his prejudice for the first time at sidebar. In such an instance, it is sufficient for the court to excuse the biased juror(s), as the court did here.

We also reject Casanova's second argument that this case differs from Parker because it, in his view, raises greater concerns regarding the possibility of racial prejudice affecting the jury's deliberations. We reject the argument's premise from the outset, as the testimony introduced at trial actually revealed that Jeffreys had abused prostitutes of different racial backgrounds, not just white prostitutes. In addition, Casanova and his victim were of the same race. Thus, the case lacked the cross-racial perpetrator-victim dynamic Casanova suggests. In any event, Parker soundly held that group voir dire was ordinarily adequate even where the inquiry into racial bias is constitutionally required because "[r]ace [is] . . . 'inextricably bound up with the conduct of defendant's trial.'" Parker, 872 F.3d at 7 (quoting United States v. Brown, 938 F.2d 1482, 1485 (1st Cir. 1991)).

B.   Finger and Palm Print Expert Testimony

Casanova next asserts on appeal, for the first time, that one of the government's witnesses provided what he characterizes as demonstrably false testimony regarding the reliability of fingerprint

analysis as a technique of forensic identification. He did not object to or move to strike this purportedly misleading testimony.

At trial, Ioan Truta, a senior criminalist in the Latent Print Unit of the Boston Police Department, testified about the history of fingerprint examinations in criminal investigations, the "ACE-V" method (analysis, comparison, evaluation, and verification) his department uses to compare fingerprints and perform identifications, and the results of analyses he performed on prints collected from the scene of Thomson's shooting. Truta identified one particular palm impression, located on a straw wrapper found in the back seat of the car in which Thomson was shot, as belonging to Casanova. Witnesses had testified that Casanova was in that back seat. On cross-examination, Truta testified, "[a]s far as I know, in the United States the[re] are not more than maybe 50 erroneous identification[s], which comparing with identification[s] that are made daily, thousands of identification[s], the error rate will be very small." Truta had previously cautioned that it would be inappropriate to claim that the rate of false-positive identifications is zero. Truta then made similar assertions on redirect regarding the number of instances of false positives known to him and the prevalence of fingerprint identifications. Truta emphasized that his testimony was based on what he had read in the literature, and expressly acknowledged that at the time of his testimony, there was "no known database of latent prints" that would

permit a statistical analysis of false-positive rates for fingerprint identifications.

The crux of Casanova's challenge is that Truta "claimed falsely that the error rate in fingerprint comparisons was effectively zero" but that it is undisputed in the scientific community that the false-positive rates for fingerprint analyses are "greater than zero."[3] Casanova argues that this alleged misrepresentation was prejudicial because Truta's palm-print identification of Casanova provided corroboration to testimony from unreliable witnesses who had placed Casanova in Thomson's car on the night of the shooting.

But Casanova's argument mischaracterizes what happened. Truta never testified that the error rate for fingerprint examinations was "effectively zero," "virtually zero," or "functionally indistinguishable from zero." Rather, Truta testified that in light of the number of recorded errors he knew of from his own review of the literature, and the number of fingerprint identifications made daily, he expected the error rate to be "very small." He did not calculate or assert any particular error rate and he specifically cautioned that whatever the rate may be, it would not be zero. On redirect he acknowledged that there was no statistical method

---

[3] Casanova does not renew on appeal his argument to the district court that expert testimony based on fingerprint analysis should be generally inadmissible. Any such challenge is waived, see United States v. Henry, 848 F.3d 1, 7 (1st Cir. 2017), and would fail in any event, see United States v. Pena, 586 F.3d 105, 109-11 (1st Cir. 2009) (noting generally that expert testimony on latent fingerprint identifications has been routinely allowed).

- 14 -

generally accepted in the field for determining actual statistical probabilities of erroneous identifications.  This is the classic stuff of cross-examination and redirect.

Even assuming, arguendo, that the jury had understood Truta as suggesting that the false-positive rate for fingerprint identifications was as low as "50 . . . out of millions," Casanova has not shown that such implied rate would have been so off base as to have made its introduction plain error.

Casanova grounds his entire challenge on a single post-trial report that provided recommendations to the executive branch regarding the use of fingerprint analysis as forensic evidence in the courtroom.  See President's Council of Advisors on Sci. and Tech., Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods (2016).  The report, issued after Casanova's trial had already ended, is not properly before this court, and in any event it does not endorse a particular false-positive rate or range of such rates.

C.    Testimony About Jeffreys's Treatment of Women Prostitutes

Finally, Casanova challenges the admission at trial of evidence as to Jeffreys's abusive treatment of the women who worked for him as prostitutes.  Several former prostitutes described in detail Jeffreys's sex-trafficking enterprise and his resort to predatory and coercive tactics -- isolating and exploiting vulnerable women, withholding their income, and prohibiting them from

interacting with other men -- as well as outright violence in order to maintain control over them.  Casanova contends that the admission of this testimony violated Federal Rule of Evidence 403 in that the risk of unfair prejudice to him substantially outweighed the testimony's probative value.

We review preserved objections to evidentiary rulings for abuse of discretion, United States v. Ford, 839 F.3d 94, 109 (1st Cir. 2016), and unpreserved objections for plain error, United States v. Almeida, 748 F.3d 41, 50 (1st Cir. 2014).  Before trial, the government moved in limine to admit evidence as to "Casanova's involvement in Jeffreys' criminal organization."  Casanova objected on the basis that evidence of his alleged participation in Jeffreys's activities would be more prejudicial than probative as to him, but did not specifically argue that testimony regarding Jeffreys's treatment of his prostitutes would be unduly prejudicial.  And when that testimony was given at trial, Casanova did not challenge it.[4] Casanova did not preserve the Rule 403 claim that he now brings on appeal.  See id. (holding that objecting to a motion in limine to admit evidence does not by itself preserve an objection to the admission of that evidence where the district court's in limine ruling admitting

---

[4]     Casanova cites in his brief a few objections that he made to testimony relating to Jeffreys's criminal activities, but none of the objections concerned Jeffreys's resort to violence against his prostitutes.

the evidence was not final and the appellant failed to object at trial).

The district court committed no error, much less plain error, in admitting testimony as to Jeffreys's abusive treatment of the prostitutes who worked for him. The testimony had substantial probative value. The government's theory of the case was that Jeffreys ordered Casanova to kill Thomson to prevent him from cooperating with law enforcement. The testimony at issue was probative of Jeffreys's motive in ordering Thomson killed because it delineated the scope and seriousness of the criminal enterprise Jeffreys wanted to protect by ordering the murder.

Moreover, Casanova's claim of "spillover" prejudice rings hollow. No witness at trial testified that Casanova himself engaged in any of the abusive acts attributed to Jeffreys. One former prostitute testified, on the contrary, that Casanova "was always really nice to [her] and polite. . . . A lot of guys were really disrespectful, and he wasn't." Casanova himself acknowledges in his brief that the "[w]itnesses consistently described Casanova as having no real involvement with Jeffreys' sex trafficking enterprise." The jury clearly distinguished between Casanova and Jeffreys and acquitted Casanova of the conspiracy charge. To the extent Casanova nonetheless feared that the jury might be inclined to punish him for Jeffreys's acts, he could have requested a limiting instruction, but never did so. Under these circumstances, Casanova's speculative

assertion on appeal that testimony regarding Jeffreys's violence inflamed the jury against him lacks force.  We conclude that the admission of the testimony did not clearly violate Federal Rule of Evidence 403.

III.

We <u>affirm</u> Casanova's conviction.